**ALPHA MEDICAL, INC., formerly known as Alpha Medical Management, Inc., Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 98–1406.

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1999.

Decided April 19, 1999.

John P. Konvalinka (argued and briefed), Thomas E. Smith (briefed), Antonio L. Matthews (briefed), Grant, Konvalinka & Harrison, Chattanooga, TN, for Petitioner–Appellant.

Richard Farber (briefed), Patricia Bowman (argued and briefed), U.S. Department of Justice, Appellate Section, Tax Division, Washington, DC, for Respondent–Appellee.

Before: MERRITT, KENNEDY, and JONES, Circuit Judges.

MERRITT, Circuit Judge.

During 1990, Taxpayer Alpha Medical Management, Inc., a medical management corporation in Tennessee, paid Mr. William Rogers, its president, director, and sole shareholder, compensation totaling $4,439,180 and claimed a deduction for that amount on its tax return for that year. Upon audit of that return, the Internal Revenue Service determined that the compensation paid to Rogers, to the extent it exceeded $400,000, was unreasonable and, therefore, nondeductible. The IRS accordingly determined a deficiency in taxpayer's 1990 income of $1,376,520. In addition, the IRS determined that taxpayer was liable for an accuracy related penalty pursuant to Internal Revenue Code section 6662(a) in the amount of $275,304.[1] In 1991 taxpayer avoided the issue of the reasonableness of Rogers' salary by becoming a subchapter S taxpayer, which allowed it to pass through its income to its shareholders without taxation at the corporate level.

Taxpayer filed a petition in the Tax Court contesting the IRS's determination. The parties filed a stipulation of facts, and trial was held on January 31, 1996. After trial, the Commissioner conceded that the compensation paid to Rogers in 1990 was reasonable, and, hence, deductible to the extent of $1,837,821. On October 14, 1997, the court filed a memorandum opinion determining that $2,300,000 constituted reasonable compensation to Rogers. T.C. Memo 1997–464, 1997 WL 630102. The court also sustained the Commissioner's penalty determination pursuant to section 6662(a) in light of the fact that Taxpayer failed to address the issue at trial or in its

---

1. All section references are to the Internal Revenue Code as in effect during the year in issue. All dollar amounts are rounded to the nearest dollar unless otherwise indicated.

briefs. The Tax Court does not explain how it reached the figure $2.3 million. It does not provide the calculations followed or the theory which leads to the figure. The figure appears merely to split the middle between the government's original position and the taxpayer's. Taxpayer filed a motion for reconsideration as to the penalty determination, which motion was denied. On January 23, 1998, the court entered its final decision that Taxpayer was liable for a deficiency in the amount of $728,829 and liable for an additional penalty in the amount of $145,766. This timely appeal ensued.

This appeal presents two questions. First, whether the Tax Court committed clear error in ruling that amounts paid to Rogers were in part unreasonable. Second, whether the Tax Court erred in finding Taxpayer liable for the accuracy-related penalty under section 6662(d) for substantially understating its income for the year in issue. For the following reasons, we reverse the judgment of the Tax Court with respect to both issues.

## I.

Since the first question involved is factual, we review the evidence in some detail. Taxpayer Alpha Medical Management, Inc., a medical management company, was incorporated in 1982 in Tennessee by William Rogers with an initial capital contribution of $1,000. He has not made any additional capital contributions. Taxpayer began operations on January 1, 1986 and by 1990 had 60 employees. Taxpayer provides management services to home health care agencies and hospitals with home health care departments. In most instances, Taxpayer's services include the management of four categories of operations: (i) reimbursement; (ii) accounting; (iii) accounts receivable, billing, and computer operations; and (iv) clinical/operational/consulting services. Taxpayer's entire operation is located in one office in Chattanooga, Tennessee, although it does business in several states. Its clients grew from one in 1986 to 60 in 1992. During 1990, the tax year at issue, Taxpayer managed accounts for 43 clients.

Since Alpha Medical Management, Inc., began operations in 1986, William Rogers has continually been its president, sole director, and sole shareholder. The Tax Court noted that at all times pertinent to this case, Rogers worked twelve or more hours a day and was available at all times of the day by telephone or pager. During and prior to 1990, Rogers made all decisions that affected Taxpayer's mid and long-range plans; he also handled any problems that arose with Taxpayer's clients or employees.

Rogers' incorporation of Alpha Medical Management, Inc. was not his first foray into the health care business. Rogers, who holds a college degree in biology and a doctorate in pharmacy, founded a durable medical equipment business which he sold to a publicly traded company in 1984. He was also the founder of a successful, local drugstore chain with seven stores which he sold in 1986. When Rogers sold his medical equipment business, he was offered a salary of over one million dollars annually to manage National Medical Equipment California Home Health Care Division. He declined that offer because he did not wish to leave Tennessee.

Alpha Medical Management, Inc. is divided into a financial and a clinical and operations division. The financial division employs several key employees, among others, who provide a complete array of accounting services for Taxpayer's clients. Mr. Rayburn Tankersley, a certified public accountant, has been Taxpayer's senior vice president of finance and chief financial officer in charge of the financial division since 1988, when he began working for the corporation. Tankersley provides strategic focus for Taxpayer's financial division. He assists in strategic planning for clients, develops and maintains client relationships, provides financial guidelines to clients, and ensures proper staffing for the financial division. Mr. Tim Stees, a certi-

fied public accountant, has been Taxpayer's vice president of finance since late 1989. Stees coordinates tax return preparation, participates in strategic planning for Taxpayer and its clients, and develops and maintains client relationships. During 1990, Stees was also responsible for supervising various functions of the payroll and accounts payable departments. Finally, Taxpayer's reimbursement and information systems departments are part of its financial division. From 1987 to 1990, Ms. Libby Walker was Taxpayer's Director of Reimbursement. In that capacity, Walker dealt with the Commerce Clearing House (CCH) guides and all other government rules and Medicare regulations.

Taxpayer's operations division provides surveys, advice, and evaluations for its clients and develops the operational and clinical products that are delivered to clients. Ms. Rebecca Worley, a registered nurse, has been Taxpayer's senior vice president of operations and chief operations officer since Taxpayer's inception in 1982. Worley's duties include deciding the direction and timing of client selection and development, translating Rogers' management vision into operational plans, ensuring proper staffing levels and training programs, guiding clients regarding the direction and actions of their companies, and overseeing and assisting in the development of Taxpayer's clinical information systems. Ms. Donna Stapleton, also a registered nurse, is Taxpayer's vice president of operations. She is responsible for the operational and clinical oversight of the field staff, acts as a liaison with state and federal fiscal intermediaries regarding regulatory issues, provides evaluations and advice to clients, and handles personnel management, development, and recruiting.

From 1986 to 1988, Taxpayer's management tasks were performed by Rogers and Worley. Tankersley and Stees joined the management team in late 1988 and late 1989, respectively. Rogers, Tankersley and Worley attended state and national home care association meetings, entertained and recruited clients, among many other shared management responsibilities. In 1990, Taxpayer's Board of Directors included: Rogers, President and CEO; Tankersley, Vice President and CFO; and Worley, Executive Vice President and Secretary.

## II.

Section 162(a)(1) of the Internal Revenue Code permits a corporation to deduct as a business expense "a reasonable allowance for salaries or other compensation for personal services actually rendered." I.R.C. § 162(a)(1). The Treasury Regulations expound upon this code section thus:

> There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.

Treas. Reg. 1.162–7(a) (1960). As the Fifth Circuit has correctly noted:

> For large, publicly held corporations, the deductibility of compensation is seldom questioned, because the corporation is usually dealing at arm's length with its employees. In a small, closely held corporation, however, the issue arises more frequently. When, as here, the corporation's shareholders are its key employees, it is in the interest of all parties to characterize amounts distributed to the shareholder-employees as compensation rather than dividends. Compensation is deductible from the corporation's income tax; dividends are not.

*Owensby & Kritikos, Inc. v. Commissioner of Internal Revenue,* 819 F.2d 1315, 1322–23 (5th Cir.1987).

Inherently, there is a natural tension between (1) shareholders/employees who

feel that they are entitled to be paid from a corporation's profits an amount that reflects their skills and efforts, and (2) a provision in the tax law that conditions the deductibility of compensation on the concept of reasonableness. What is reasonable to the entrepreneur/employee often may not be reasonable to the tax collector. Accordingly, courts are asked to examine the relevant facts and circumstances of the business and the underlying employment relationship in order to render an opinion as to whether the compensation paid was reasonable.

■ Whether an employee's compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of the case. *See Mayson Mfg. Co. v. Commissioner,* 178 F.2d 115, 119 (6th Cir.1949). In addressing the reasonableness issue, we are guided by the relevant factors enunciated by this Court in *Mayson.* These include, *inter alia:* (a) the employee's qualifications; (b) the nature, extent and scope of the employee's work; (c) the size and complexities of the business; (d) a comparison of salaries paid with gross income and net income; (e) the prevailing general economic conditions; (f) comparison of salaries with distributions to stockholders; (g) the prevailing rates of compensation for comparable positions in comparable concerns; (h) the amount of compensation paid to the employee in previous years; and (i) the salary policy of the taxpayer as to all employees. *See id.* at 118. No single factor is decisive of the question; rather, we must consider and weigh the totality of the facts and circumstances. The finding of the Tax Court must be affirmed unless clearly erroneous, *see id.* at 119, that is, where on the entire evidence we are "left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We begin our discussion with the well-accepted principle that the Commissioner's determination of reasonableness carries a presumption of correctness. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). The burden is on the taxpayer to show that it is entitled to a deduction larger than that allowed by the Commissioner. *See Botany Worsted Mills v. United States,* 278 U.S. 282, 289–90, 49 S.Ct. 129, 73 L.Ed. 379 (1929). In analyzing the *Mayson* factors, this Court must carefully scrutinize the facts of a case in which the paying corporation is controlled by the employees to whom the compensation is paid. In such a situation, we must be convinced that the purported compensation was paid for services rendered by the employees/shareholders, as opposed to a distribution of earnings to them that the payor could not deduct. As the Treasury Regulations state:

> Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock.

Treas. Reg. 1.162–7(b)(1) (1960). Salaries, as well as bonuses, *see* Treas. Reg. 1.162–9, thus are deductible only in an amount that is "reasonable under all the circumstances," that is, "only [in] such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Treas. Reg. 1.162–7(b)(3).

*a. Employee's Qualifications*

■ In the instant matter, the Tax Court found that Taxpayer's "success is mainly attributable to Rogers' ambition,

creativity, vision, and energy....'' T.C. Memo 1997–464, at 15, 1997 WL 630102. Before incorporating Alpha Medical Management, Inc., Rogers founded and eventually sold two other successful health care business concerns. Applying his 25 years of practical business experience, Rogers was instrumental in developing Taxpayer's computer software programs, policy manuals, and cost-efficient operating procedures. His hard work, talent, and considerable experience were the linchpin of the corporation's success. We agree that this factor favors Taxpayer.

### b. The Nature, Extent, and Scope of Rogers' Work

By all accounts, Rogers has been the *sine qua non* of Taxpayer's remarkable growth since its founding. At one time or another since its inception, Rogers has held most of the management positions at Alpha Medical. The Tax Court found that he has consistently worked 12 hours each day in the office and is on call around the clock. His responsibilities have covered a wide range of activities, including sales, personnel, operations, finance, planning, and even piloting the corporate airplane. While there is no doubt that Rogers was aided by a capable management team, the Tax Court found that "[t]he record shows that no other officer [in the corporation] has the breadth of experience with the company which Rogers has." T.C. Memo 1997–464, at 16, 1997 WL 630102. The court added: "Rogers is petitioner's primary salesman and deal closer; he personally obtained each of petitioner's clients and negotiated each contract petitioner made with its clients." *Id.* These efforts resulted in considerable financial success for the company. Since 1986, Taxpayer's gross receipts have increased almost 12 times; taxable income has increased almost 18 times; and net worth has shown an increase of over 35 times. For 1990, the tax year in question here, the company's gross receipts were 98 percent greater than its 1989 receipts, even though expenses increased by 27 percent.

The record shows that this cost-effective performance is attributable in large part to innovative management programs developed by both Rogers and Worley. We agree with the Tax Court that this factor favors Taxpayer.

### c. Size and Complexities of Petitioner's Business

From 1986, the date of Taxpayer's incorporation, to 1990, the tax year in question, the number of employees at Alpha Medical increased from two to 60; the number of its locations rose from one to 43, including expansion from Tennessee into Kentucky, Arkansas, and Mississippi. A significant amount of this growth occurred between 1989 and 1990: approximately 30 percent of the increase in client locations occurred during that year, and the number of home health care visits managed by Taxpayer in 1990 doubled.

Alpha Medical is a complex business. As the Tax Court noted:

> The management of the home health care business requires special expertise with regard to Medicare, Medicaid, insurance requirements, and state health care licensing regulations. In addition to technical expertise, compliance with the various insurance programs requires accurate documentation of each home visit. Petitioner managed the documentation and reporting of almost a million home health care visits in 1990. The documentation and reporting of these visits included both clinical information and claims information which were processed through the Alpha Information System that was designed in party by Rogers and Worley and implemented by Rogers.

T.C. Memo 1997–464, at 18, 1997 WL 630102. We thus agree with the Tax Court that this factor favors Taxpayer.

### d. Comparison of Salaries Paid with Gross and Net Income

Taxpayer's net taxable income for the year 1990 was $6,871,433, while Rogers' compensation was $4,439,180, or 64.6 percent of Taxpayer's net taxable income and

44.9 percent of gross receipts. As the Fifth Circuit has noted, "[a]lthough it is often helpful to consider compensation as a percentage of both gross receipts and net income, the latter is in most cases more probative because it more accurately guages whether a corporation is disguising the distribution of dividends as compensation." *Owensby & Kritikos, Inc. v. Commissioner of Internal Revenue*, 819 F.2d 1315, 1325–26 (5th Cir.1987). The instant matter represents a quintessential example of the existence of a corporate pattern of distributing most of the corporation's taxable income as deductible compensation rather than as nondeductible dividends. The Commissioner argues persuasively that it is particularly telling that Rogers, who as the corporation's president and sole shareholder, alone made all salary and dividend distribution decisions, received over $4.4 million in deductible salary but only $1,500 as nondeductible dividends. Taxpayer duly cites a number of cases where the Tax Court found that the compensation by the taxpayer was reasonable even though it was a large portion of the taxpayer's gross receipts and net income.[2] However, in each of those cases, the compensation at issue was paid to two officer/shareholders, as opposed to the instant case where the compensation being challenged was paid to only one employee, Rogers. Those cases are thus soundly distinguishable from the instant matter. We agree with the Tax Court that this factor favors Commissioner.

e. *The Prevailing General Economic Conditions*

Examining general economic conditions during the tax years in question helps to determine whether the success of a business is attributable to general economic conditions as opposed to the efforts and business acumen of the employees. At trial, Taxpayer presented the expert testimony of Mr. James Hughes, an expert on compensation with the consulting firm of Arthur Anderson & Co., and submitted a report that he coauthored with Mr. Bruce Benesh, who did not testify. Hughes and Benesh concluded that the compensation paid Rogers was reasonable, basing their conclusion on various sources, one of which was relevant industry and compensation data. In their joint report, Taxpayer's experts provide data to the effect that there were fewer licensed health care agencies in the State of Tennessee in each year after 1986. From this fact they concluded both that (1) the health care industry was "slowing down" during the period from 1986 to 1990, *see* T.C. Memo 1997–464, at 23, 1997 WL 630102, and (2) that taxpayer's increase in gross receipts, net income, and retained earnings during that same period was attributable to Rogers' business acumen and industry experience.

The Tax Court correctly noted that depending on what it believed to be the facts and circumstances of the case, it could either reject the expert opinion in its entirety, accept it in its entirety, or accept selective portions of it. *See id.* at 22, 1997 WL 630102 (citing *Helvering v. National Grocery Co.*, 304 U.S. 282, 294–95, 58 S.Ct. 932, 82 L.Ed. 1346 (1938)). Acknowledging the objective fact that there were fewer health care agencies in Tennessee after 1986, the Tax Court rejected the

---

**2.** *See Acme Constr. v. Commissioner*, 69 T.C.M. (CCH) 1596 (1995) (reasonable compensation was 10.2% of gross income of $4,330,871 and 73.23% of net taxable income of $603,771); *Boca Constr. v. Commissioner*, 69 T.C.M. (CCH) 1589 (1995) (reasonable compensation was 27.7 and 31.9% of gross receipts of $2,488,322 and $2,558,903 for 1989 and 1990, respectively, and approximately 80% of net income of $847,328 and $1,055,086); *Mad Auto Wrecking Inc. v. Com-*missioner, 69 T.C.M. (CCH) 2330 (1995) (reasonable compensation was 34, 28, and 38% of gross receipts of $2,554,942, $2,169,125 and $1,884,853 and 93, 91, and 103% of net taxable income $923,690, $662,974, and $668,801 for 1989, 1990, and 1991, respectively); *Pulsar Components Int'l, Inc. v. Commissioner*, 71 T.C.M. (CCH) 2436 (1996) (reasonable compensation was 27.3% of gross receipts of $10,693,635 and 82.4% of $3,546,647 taxable net income in 1985).

conclusion urged by Taxpayer's expert. The Tax Court reasoned that Hughes' data only showed that there were fewer home health care agencies, not that fewer dollars were being spent on home health care during the period in question:

> Significantly, although Hughes and Benesh characterized the home care industry as "contracting", they provided no data that shows that the health care business actually was contracting, instead of consolidating. The data shows only that there were fewer home health care agencies, not that there were fewer dollars spent on home health care. In fact, due to the 1989 changes in the regulations governing reimbursements to home health care agencies by Medicare, payment for a greater number of services was allowed, which provided potential for increased revenue. Thus, the data actually shows that each year there were fewer agencies operating in a business that had expanding opportunities for greater revenue. Under these facts and circumstances, we do not assume that a consolidation phase is a per se adverse economic condition for a business.

T.C. Memo 1997–464, at 23–24, 1997 WL 630102.

The Tax Court as a finder of fact is the exclusive judge of the credibility of witnesses and the weight to be given their testimony. We agree with its assessment that Taxpayer's evidence does not support a finding that the home health care industry suffered from adverse economic conditions, or that the industry was significantly more competitive in 1990 than it was in 1989. This factor thus favors Commissioner.

*f. Comparison of Salaries Paid with Distributions of Retained Earnings*

■ The failure to pay more than a nominal dividend may suggest that some of the amounts paid as compensation to a shareholder/employee is really a dividend. The absence of a consistent, developed dividend history may raise a "red flag" that invites the special scrutiny of the

Court, *Edwin's Inc. v. United States,* 501 F.2d 675, 677 n. 5 (7th Cir.1974), and justifies an inference that some of the purported compensation was actually a distribution of profits, *see Charles Schneider & Co. v. Commissioner,* 500 F.2d 148, 153 (8th Cir.1974). It is true that a closely held corporation may have valid business reasons for not paying dividends; for example, it may choose to retain its earnings to fuel future growth. An individual shareholder may participate in the success of a corporation through the appreciation in the value of his stock brought on by retained earnings and the possibility of a future return. For reasons perfectly acceptable under the tax code, many investors prefer stock appreciation over dividends. Indeed, many corporations with publicly traded stock pay no dividends. Accordingly, a court should look not only at a corporation's dividend practices, but also at the total return the corporation is earning for its investors, namely its shareholders. The best indicator of the return a corporation is earning for its investors is its return on equity. *See Owensby,* 819 F.2d at 1326–27. "If ... the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary." *Elliotts, Inc. v. Commissioner,* 716 F.2d 1241, 1247 (9th Cir.1983). In the instant matter, of course, Rogers was the lone shareholder. His equity grew from $97,623 at yearend 1986 to $1,708,137 at yearend 1989 to $3,389,705 at yearend 1990. His total return on equity for the tax year at issue was thus 98.65%, a return with which any independent investor would no doubt be satisfied. We agree with the Tax Court's conclusion that this factor favors Taxpayer.

*g. Prevailing Rates of Compensation for Comparable Positions in Comparable Concerns*

Treasury Regulation 1.162–7(b)(3) provides that "reasonable and true compen-

sation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Courts have recognized that in reasonable compensation cases, "the central inquiry often focuses on the market value of the services rendered," *Owensby*, 819 F.2d at 1330, and that "prevailing rates of compensation for comparable positions in comparable concerns can be the most significant factor in determining reasonable compensation," *Rutter v. Commissioner*, 853 F.2d 1267, 1273 (5th Cir. 1988).

In the instant matter, Taxpayer relied on the expert testimony of Hughes and Benesh, whose report was unable to locate any comparable survey data on home health care agency managers similar to Rogers. They were thus unable to perform any sort of relevant direct comparison. Instead, they analogized his role in the corporation to that of a physician. Hughes and Benesh determined that Rogers' average annual compensation was approximately 18 percent of Taxpayer's total revenue, whereas for a physician the average Medicare compensation-to-production ratio is 40 percent, and the compensation for a physician in the 90th percentile is 59 percent, which exceeds the percentage paid to Rogers in 1990. Alternatively, Hughes and Benesh used a real estate agent as an analogy with which to compare Rogers' position and compensation. The experts found that median compensation for real estate agents who are paid on a sliding scale starts at 55 percent of the commission paid by the sellers to the real estate broker and increases to 63 percent. On the basis of these comparisons, Hughes and Benesh determined that Rogers' compensation as a percentage of gross revenue was low.

The Tax Court found Hughes' and Benesh's opinion unpersuasive and so do we. With respect to their report's comparison of Rogers to a physician, the Tax Court noted that this "superficial comparison is specious and is accorded no weight." T.C.

Memo 1997–464, at 30, 1997 WL 630102. Similarly, the court was not at all convinced by their comparison of Rogers to a real estate agent. Notably, the industry publication relied on by Hughes and Benesh for their data regarding real estate sales agents reports that the net amount of compensation paid to agents in the South in 1992 was approximately $31,000. Moreover, the typical agent was also a 49–year old female who derived 67 percent of her household income from the practice of residential real estate. By contrast, Rogers elected to have Taxpayer pay him over $4.4 million in 1990. The Tax Court thus found that the experts' opinion in this regard was "of dubious value." *Id.* at 31, 1997 WL 630102. It concluded: "We do not find that the data relied upon by Hughes' and Benesh's report supports their conclusion. Hughes' and Benesh's total disregard of the actual amounts paid to those who, in their opinion, perform jobs requiring functions comparable to those required of Rogers is suspect." *Id.* We find no error by the court in rejecting the opinion that Rogers' compensation could be compared to these other professionals as benchmarks for reasonableness. We agree with the Tax Court's determination that this factor favors neither party and is therefore neutral.

*h. Amount of Compensation Paid to Rogers in Previous Years*

Taxpayer contends that the compensation paid Rogers in 1990 was meant to compensate him for undercompensation in earlier years, a practice made permissible in *Lucas v. Ox Fibre Brush Co.*, 281 U.S. 115, 50 S.Ct. 273, 74 L.Ed. 733 (1930). A taxpayer making such a claim must show: (1) the insufficiency of the officer's compensation in the previous year; and (2) the amount of the current year's compensation that was intended as compensation for that underpayment. *See Pacific Grains, Inc. v. Commissioner*, 399 F.2d 603, 606 (9th Cir.1968). In the instant matter, the Tax Court found as a matter of fact that the $500,000 increase in Rogers' base salary was intended to compensate

him for service in prior years. *See* T.C. Memo 1997–464, at 36, 1997 WL 630102. Accordingly, only the first prong of the test is at issue here. The Commissioner denies that Rogers was undercompensated in prior years. However, the Tax Court took into account the fact that Rogers rejected a job that offered to pay him in excess of $1 million annually to manage the home health care division of a company in California so that he could concentrate on developing Taxpayer as a successful business concern. Reviewing Rogers' salary for the years 1986 ($66,943), 1987 ($75,914), 1988 ($431,702) and 1989 ($928,-883), the Tax Court thus found that it was "evident ... that Rogers was underpaid in each of those four years." T.C. Memo 1997–464, at 37, 1997 WL 630102. The court therefore found that Taxpayer met its burden of proving that part of the compensation paid Rogers in 1990 was intended to compensate him for services he performed prior to 1990. We agree that this factor favors Taxpayer.

*i. Taxpayer's Salary Policy As To All Employees*

We look next to the salaries paid to Taxpayer's other employees to determine whether Rogers was compensated differently than the corporation's other employees solely because of his status as a shareholder. In 1990 Taxpayer deducted total compensation paid to its employees of $6,075,444. As a percentage of total compensation paid, Rogers received 73 percent, even though the company had 60 employees. Moreover, of the compensation paid to Taxpayer's seven key employees, 85.99 percent was paid to Rogers. Moreover, as the Tax Court noted, the compensation of the highest paid *nonshareholder*, Worley, was 5.1 percent of the amount paid to Rogers, *see* T.C. Memo 1997–464, at 32–33, 1997 WL 630102, a disparity the Court deemed "patent," *id.* at 33, 1997 WL 630102.

Contingent compensation formulas, typically tied to gross revenue or profits, are often adopted to inspire productivity. When such compensation is paid under a longstanding arm's length agreement, it will usually be upheld even if an incentive formula results in greater compensation than the parties anticipated at the time they entered the contract. *See Owensby*, 819 F.2d at 1328; *Elliotts, Inc.*, 716 F.2d at 1248. In the instant matter, Rogers' bonus formula was established in the corporate minutes in 1989. The record thus fully supports the Tax Court's finding that the bonus formula was not longstanding. *See* T.C. Memo 1997–464, at 34, 1997 WL 630102. Moreover, Rogers is Taxpayer's sole shareholder, its director, and its president. He alone determined the salary and bonus compensation of every employee, including himself. It therefore cannot be said that he was dealing with the company at arms-length. Where this is so, the amount of compensation may be unreasonable. In addition, Rogers' compensation rose from $928,883 in 1989 to $4,439,180 in 1980. As the Tax Court found, "the dramatic increase raised the stakes involved and thereby increased [the Commissioner's] incentive to challenge the payments." *Id.* Finally, we agree with the Tax Court's finding that it is irrelevant that Taxpayer was audited in 1989 and not found to have had a tax deficiency. *See Owensby*, 819 F.2d at 1329. Where an employee/shareholder's increase in salary rises from one tax year to the next as dramatically as in the instant matter, the Commissioner's acceptance of a formula in a prior audit is not necessarily a fact of significant probative value; "[r]ather, it merely indicates that the IRS concluded that it would not be worthwhile to assert that the *amount* of compensation paid was unreasonable." *Id.*

The Tax Court concluded: "The great disparity between the amounts paid to the nonshareholders and the sole shareholder—Rogers—and the fact that Rogers' compensation plan was not the result of a longstanding arms-length agreement point to the conclusion that the compensation paid Rogers in 1990 was in part unreasonable." T.C. Memo 1997–464, at 34–35, 1997 WL 630102. While we acknowledge

that this increase in salary is at first glance somewhat eye-opening, we disagree, in light of the fact that Rogers was grossly underpaid for several consecutive years, with the Tax Court's ultimate conclusion that Rogers' compensation in 1990 was unreasonable. In the health care industry, as well as many other industries, corporations have been allowed without contest to deduct executive compensation packages more than ten times the level received by Rogers. In light of Rogers' record of accomplishment, the risks he assumed and the amazing growth of his company, reasonable shareholders who had invested only a few dollars in a fledgling enterprise would readily have agreed to Rogers' level of compensation. In five years he had taken a company capitalized with $1000 from nothing to a net profit of almost $7 million. In this situation, the factual record and some notion of parity with other highly successful executives requires a different result from that reached by the Tax Court.

### III.

The Tax Court concluded its analysis thus:

> [W]e must use our best judgment, after weighing the evidence, to reconcile and integrate the factors discussed above and reach our ultimate conclusion. Because of all the factors and circumstances here present, we have given the issue herein a close scrutiny with the result that we agree with neither petitioner nor respondent. On the basis or our examination of the entire record we hold that $2.3 million constituted reasonable compensation to Rogers for personal services to petitioner in 1990 and in prior years.

T.C. Memo 1997–464, at 37, 1997 WL 630102.

In the instant matter, we reverse the judgment of the Tax Court, as we are "left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). William Rogers is a highly qualified businessman and is largely responsible for the noteworthy success of his company in a highly specialized and complex field. Since 1986, Rogers has continually been the company's president, sole director, and sole shareholder. At all times pertinent to this case, Rogers worked at least twelve hours daily and was available around the clock to address the needs of his company. His contributions to the company cannot be overstated. Moreover, Rogers assumed not only the plethora of risks associated with founding and developing a successful business concern, but he also incurred a substantial economic opportunity cost when he turned down the management position in California that would have paid him at least $1 million annually. We therefore find that Rogers' compensation for the 1990 tax year did not exceed the amount needed to remedy prior years of undercompensation, and was therefore reasonable. Accordingly, there can be no penalty for underpayment of taxes.

For the foregoing reasons, the judgment of the Tax Court is reversed.