**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 4 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

EBERL'S CLAIM SERVICE, INC.,

      Petitioner - Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent - Appellee.

No. 99-9033

---

**Appeal from the United States
Tax Court
(T.C. No. 12385-97)**

---

Mark R. Kravitz (Joseph A. Sanfilippo, Jr., Wiggin & Dana, New Haven,
Connecticut and John D. Moats, Englewood, Colorado, with him on the briefs),
Wiggin & Dana, New Haven, Connecticut, for the Petitioner-Appellant.

Joan I. Oppenheimer (Gilbert S. Rothenberg with her on the brief), Tax Division,
Department of Justice, Washington, D.C., for the Respondent-Appellee.

---

Before **LUCERO**, **McKAY** and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

      The Commissioner of Internal Revenue determined deficiencies and

additions to tax for Eberl's Claim Service, Inc.'s ("taxpayer") fiscal years 1992

and 1993,[1] in which taxpayer sought to deduct $4,340,000 and $2,080,000, respectively, for compensation to Kirk J. Eberl ("Eberl"). Contending that those amounts were excessive, the Commissioner asserts Eberl's salary constituted disguised dividend payments that should have been subject to taxation. The Tax Court found taxpayer could deduct compensation up to $2,340,000 and $1,080,000 and was not liable for penalties. Taxpayer appeals; exercising jurisdiction under I.R.C. § 7482, we affirm.

## I

Eberl is the founder, president, and sole shareholder of taxpayer, a Colorado corporation. Taxpayer is a catastrophic claims adjusting company that provides the services of independent claims adjusters to major insurance companies. Insurance companies rely on in-house adjusters to process most claims, but during busy periods following major disasters they turn to contractors like taxpayer for additional help.

Taxpayer was founded as a sole proprietorship in 1987 and incorporated in 1988. Eberl made an initial capital investment of $500 and has not invested any additional capital. He was the only member of taxpayer's board of directors from June 8, 1988 through the years in question. His wife, Grace Eberl, has been the

---

[1] Taxpayer's fiscal year 1992 ended on May 31, 1993, and its fiscal year 1993 ended on May 31, 1994.

company's corporate secretary and treasurer since incorporation. Eberl has always been solely responsible for taxpayer's business decisions and managerial functions (with the exception of accounting), including marketing, subcontracting with individual claims adjusters, and maintaining relationships with insurance companies that use taxpayer's services. During the years in question, Eberl worked long hours, occasionally from 4:30 a.m. until midnight, and was required to be away from home about seventy-five percent of the time. His superior qualification for his position and his indispensability to taxpayer's business are undisputed, as is the demanding nature of his work.

Eberl's July 19, 1988 employment agreement with taxpayer did not fix the amount of his compensation or a formula for its computation, though taxpayer's attorney, certified public accountant, and financial adviser had discussed with Eberl his desire to be compensated at twenty to twenty-five percent of taxpayer's gross receipts each year. However, a 1992 amendment loosely tied Eberl's salary to gross revenues, providing that "[t]he Corporation shall pay [Eberl] a commission based upon the gross revenue collected for services performed for casualty insurance companies who contract with the Corporation due to Employee's efforts." (Jt. Ex. 13-M.) The corporation paid regular salaries to only a small number of additional employees. Grace Eberl received an annual salary of $120,000, and beginning in 1991 her mother drew a salary as an office

manager. Neither received bonuses. The only other employees during the period in question were part-time clerical staff. Although independent claims adjusting companies typically pay their adjusters sixty to sixty-five percent of the fee charged to an insurance company, taxpayer paid its adjusters seventy percent.

Operating results and Eberl's compensation from incorporation through the fiscal years at issue were as follows:

| Year | Eberl's Salary ($) | Gross Receipts ($) | Net Profits ($) | Taxable income ($) | Eberl's Salary as a % of Gross Receipts |
|---|---|---|---|---|---|
| 1988 | 40,000 | 282,682 | (3609) | (3609) | 14.1 |
| 1989 | 608,000 | 4,141,872 | 0 | (3609) | 14.7 |
| 1990 | 300,000 | 2,190,835 | (36,233) | (39,842) | 13.7 |
| 1991 | 190,000 | 2,193,708 | 2861 | (36,981) | 8.7 |
| 1992 | 4,340,000 | 20,438,803 | 22,439 | (14,542) | 21.2 |
| 1993 | 2,080,000 | 9,168,585 | 41,935 | 27,393 | 22.7 |

(Appellee's Br. at 9, 11.) Annual and cumulative retained earnings in those years were as follows:

| Year | Annual ($) | Cumulative ($) |
|---|---|---|
| 1988 | (4655) | (4655) |
| 1989 | (5750) | (10,405) |
| 1990 | (41,276) | (51,681) |
| 1991 | 4650 | (47,031) |
| 1992 | 16,748 | (30,283) |
| 1993 | 37,098 | 6815 |

Eberl's Claim Serv., Inc. v. Comm'r, No. 12385-97, 77 T.C.M. (CCH) 2336, slip mem. at 12 (T.C. Memo. June 25, 1999). The company has never paid a dividend.

Due in part to an extraordinary number of major catastrophes, 1992 and 1993 were lucrative years for independent claims adjusters. Five of the ten most costly insured catastrophes in the United States occurred during taxpayer's fiscal years 1992 and 1993, including Hurricane Andrew, the Northridge earthquake, severe winter storms in twenty states, Hurricane Iniki, and brush fires in California. The sharp increase in gross receipts in those two years reflects the frequency with which insurance companies turned to taxpayer to supply independent adjusters to process the unusually large number of claims.

Faced with the question whether Eberl's compensation in 1992 and 1993 was reasonable in amount, the Tax Court concluded that "a substantial part of Eberl's compensation was a disguised dividend and not purely for services." Id. at 32. Although the Commissioner's expert, James F. Carey, stated in his report that compensation of $500,000 and $400,000 would have been reasonable in those two years, he acknowledged at trial that taxpayer could have paid Eberl $2,340,000 in 1992 and $1,080,000 in 1993 while keeping retained earnings of $2 million and $1 million—figures he called reasonable. Based on that assessment, the Tax Court determined that reasonable compensation to Eberl could have been as much as $2,340,000 in 1992 and $1,080,000 in 1993 and that payments above those amounts were taxable as dividends.

Finally, the Tax Court rejected the Commissioner's determination that taxpayer was liable for a penalty under I.R.C. § 6662 for substantial understatement of tax owed. The court found that Eberl reasonably believed that compensation equal to twenty to twenty-five percent of gross receipts would be a reasonable salary and that he believed his accountant, who signed taxpayer's tax returns, agreed. See I.R.C. § 6664(c)(1) (providing that the § 6662 penalty does not apply if the taxpayer shows that there was reasonable cause for the underpayment and that taxpayer acted in good faith).

## II

"We review tax court decisions 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.'" Kurzet v. Comm'r, 222 F.3d 830, 833 (10th Cir. 2000) (quoting I.R.C. § 7482(a)(1)). The reasonableness of an expense is a question of fact subject to clear error review. Pepsi-Cola Bottling Co. v. Comm'r, 528 F.2d 176, 179 (10th Cir. 1976).

### A. Determination of reasonableness under I.R.C. § 162(a)(1)

A taxpayer may deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." I.R.C. § 162(a)(1). The taxpayer bears the burden of establishing that its expenses are reasonable under § 162. Kurzet, 222 F.3d at 834; Pepsi-Cola Bottling, 528 F.2d at 179.

For closely held corporations, the identity between shareholders and employees creates an incentive to distribute earnings in the form of compensation rather than in the form of dividends. Compensation is a deductible expense, while dividend payments are subject to the two-tier system of corporate taxation. Absent a third-party interest in limiting compensation for the sake of profitability, dividends may be disguised as salary and channeled out of the corporation tax-free. Because of the potential for avoiding taxation in this manner, "special scrutiny should be given to compensation paid by a corporation whose stock is closely held." Pepsi-Cola Bottling, 528 F.2d at 179; see also Treas. Reg. § 1.162-7(b)(1) (noting that "[a]n ostensible salary paid by a corporation may be a distribution of a dividend on stock," particularly "in the case of a corporation having few shareholders, practically all of whom draw salaries"). The requirement that compensation be in a reasonable amount and for services actually rendered ensures that a corporation may not improperly lessen its tax burden by characterizing earnings distributions as salary.

In assessing whether an expense was reasonable under § 162(a)(1), this Court employs the traditional multi-factor test of reasonableness outlined in Pepsi-Cola Bottling, 528 F.2d at 179. When determining the reasonableness of a salary, "[t]he situation must be considered as a whole, with no one factor being decisive." Id. The factors to be considered have been "stated innumerable

times" but never reduced to a definitive list. Id. (listing nine factors used to determine reasonableness of compensation); see also Owensby & Kritikos, Inc. v. Comm'r, 819 F.2d 1315, 1323 (5th Cir. 1987) (applying a test consisting of eight factors); Elliotts, Inc. v. Comm'r, 716 F.2d 1241, 1245 (9th Cir. 1983) (applying a test consisting of five broad categories of factors); Mayson Mfg. Co. v. Comm'r, 178 F.2d 115, 119 (6th Cir. 1949) (applying a test consisting of nine factors); Foos v. Comm'r, 41 T.C.M. (CCH) 863, 878–79 (1981) (applying a test consisting of twenty-one factors); Treas. Reg. § 1.162-7(b)(3) (stating that salaries are deductible in an amount that is "reasonable under all the circumstances").

Relying primarily on what it could discern from the testimony of the parties' experts, the Tax Court examined twelve factors to determine reasonableness:

> (1) The employee's qualifications; (2) the nature and scope of the employee's work; (3) the size and complexity of the business; (4) general economic conditions; (5) the employer's financial condition; (6) a comparison of salaries paid with sales and net income; (7) distributions to shareholders and retained earnings; (8) whether the employee and employer dealt at arm's length, and if not, whether an independent investor would have approved the compensation; (9) the employer's compensation policy for all employees; (10) the prevailing rate of compensation for comparable positions in comparable companies; (11) compensation paid in prior years; and (12) whether the employee guaranteed the employer's debt.

Eberl's Claim Serv., slip mem. at 14–15 (citations omitted).

The Tax Court weighed the evidence in light of those factors and concluded taxpayer had not carried its burden of showing Eberl's compensation was reasonable. Taxpayer challenges the court's resolution of several individual components of the multi-factor test as well as its ultimate determination of what level of compensation would have been reasonable. Because substantial evidence supported the findings and ultimate determination of the Tax Court, we conclude its decision was not clearly erroneous.

1. Compensation In Prior Years

Citing an arrangement that allegedly provided for annual compensation of twenty to twenty-five percent of gross receipts, taxpayer asserts that Eberl's spiked salary in 1992 and 1993 did not represent a significantly higher proportion of gross receipts than in prior years. According to taxpayer, the alleged contingent compensation arrangement should have been viewed as evidence that his salary was reasonable.

In Pepsi-Cola Bottling , the taxpayer contended "that a compensation arrangement does not lose its good faith character because its automatic operation in later years under favorable circumstances results in high compensation," 528 F.2d at 181, and cited a Treasury regulation generally approving the deduction of salaries paid pursuant to contingent compensation arrangements,      see Treas. Reg. § 1.162-7(b)(2). Holding that the Tax Court properly declined to adopt the

- 9 -

taxpayer's logic in that case, we noted that "the premise of the [Treasury] regulation is a free bargain made solely for the purpose of securing the services of the employee." Pepsi-Cola Bottling, 528 F.2d at 181; see also Elliotts, 716 F.2d at 1247 (holding that only a longstanding, consistently applied compensation plan negotiated at arm's length is evidence of reasonableness).

In the case on appeal, as in Pepsi-Cola Bottling, a longstanding, consistently applied plan negotiated at arm's length "is not actually present, since the arrangement was in substance an agreement between [Eberl], acting as the predominant shareholder of the company, and [him]self, acting as an individual employee." [2] 528 F.2d at 181.

This Court has treated contingent compensation schemes as inherently suspect in cases like this one:

> Indeed, the reason for the scrutiny of contingent compensation arrangements in close corporations is the suspicion that deductible salary expenses are a disguise for non-deductible profit distributions. . . . The non-payment of a dividend in conjunction with a contingent compensation scheme for a controlling shareholder has frequently been recognized as an indication that unreasonable and excessive compensation is being paid.

---

[2] As taxpayer acknowledges, "there was no formal written documentation of such formula," and the Tax Court did not find that such an arrangement existed, written or unwritten. (Appellant's Br. at 48.)  No contingent compensation formula was mentioned in Eberl's written employment agreement or in the minutes of taxpayer's annual board meetings, at which Eberl set the amount of his compensation.  Mark Lehrner, taxpayer's CPA, testified that "[t]here was never an actual, definitive—actual 20 percent formula."  (I Trial Tr. at 82.)

Id. at 182–83 (citations omitted).

Moreover, if there was a contingent compensation arrangement, it was not consistently applied: Eberl determined the level of his salary at the end of each year, when taxpayer's gross receipts and overhead were known, enabling him to "receive virtually all of [taxpayer's] net profits as compensation." [3] Eberl's Claim Serv., slip mem. at 22; see also Golden Constr. Co. v. Comm'r, 228 F.2d 637, 639 & n.1 (10th Cir. 1955) (holding that a salary paid to a president and principal shareholder was unreasonable when he set his own salary at the end of the year). Whether or not a formula was used, Eberl's salary depleted taxpayer of almost all of its value and was plausibly viewed as unreasonable on that ground alone. [4]

2. General Economic Conditions

Taxpayer argues that the factor designated as "general economic conditions" was incorrectly resolved in the Commissioner's favor. (Appellant's Br. at 53.) While taxpayer attributes its dramatically increased revenues in 1992 and 1993 to Eberl's effectiveness as a manager and marketer, the Tax Court correctly observed that the company "benefited [sic] tremendously from the large

---

[3] As the table above shows, Eberl's salary as a percentage of gross receipts varied from as low as 8.7% to as high as 22.7%.

[4] "A bonus contract that might be reasonable if executed with an executive who is not a controlling shareholder may be viewed as unreasonable if made with a controlling shareholder, since incentive to the stockholder to call forth his best effort would not be needed." Pepsi-Cola Bottling, 528 F.2d at 182.

amount of catastrophes (5 of the 10 largest in history) during its fiscal years 1992 and 1993." Eberl's Claim Serv., slip mem. at 19. As the Commissioner points out, taxpayer had its largest gross receipts in the same year as the nation's most costly catastrophe, Hurricane Andrew.

Although Carey, the Commissioner's expert, concluded in his report that general economic conditions were neutral indicators of reasonableness, it was not clear error for the Tax Court to take a different view in light of the evidence. See Pepsi-Cola Bottling, 528 F.2d at 180–81 (concluding the Tax Court may disregard even the persuasive evidence of expert witnesses and draw inferences from other evidence). Moreover, Carey changed his assessment of this factor to a "minor negative" after viewing a stipulation concerning catastrophic losses from 1971 through 1995. (II Trial Tr. at 379.) For his part, taxpayer's expert, Albert S. Williams, addressed economic conditions only by noting that "[r]evenues were directly correlated to [Eberl's] marketing efforts and results, the need for services, i.e., catastrophes, and the ability to provide the service." (Pet'r's Ex. 49 at 3 (emphasis added).)

The Tax Court emphasized that general economic conditions are relevant only as far as they help to discern "the extent of the employee's effect on the company." Eberl's Claim Serv., slip mem. at 18; see also Alpha Med., Inc. v. Comm'r, 172 F.3d 942, 948 (6th Cir. 1999) ("Examining economic conditions

- 12 -

during the tax years in question helps to determine whether the success of a business is attributable to general economic conditions as opposed to the efforts and business acumen of the employees.").  It was not clear error for the Tax Court to determine that taxpayer's elevated receipts in 1992 and 1993 were a product primarily of an expanded market for its services and only secondarily of "the efforts by Kirk Eberl to position [taxpayer]" to take advantage of that market.  (Appellant's Br. at 54.)

3.  Compensation of Other Employees

Taxpayer's contention that its generous compensation of its independent adjusters should have weighed in its favor is unconvincing.  As the Tax Court correctly recognized, taxpayer's "payment policy for its adjusters is not similar to [taxpayer's] payment policy for Eberl" because the adjusters were independent contractors who received a flat-rate commission five to ten percent above the industry norm while Eberl's "salary" amounted to a year-end distribution of net income. [5]  Eberl's Claim Serv._, slip mem. at 27.

Taxpayer's attempt to contrast the independent adjusters' situation to Eberl's betrays the weakness of its position.  By arguing that "[t]he independent contractors took absolutely no risk and therefore would not deserve to share in

---

[5]  In fiscal year 1992, Eberl's compensation was 99.5% of taxpayer's net income before deduction for taxes, net operating losses, and compensation.  In fiscal year 1993, that number was 98%.

the company's _profits_," taxpayer all but admits that Eberl's large salary was not compensation for services, but a disguised distribution of profits—undoubtedly a reward for the risk he bore, but a reward in the nature of a taxable return on his investment. (Appellant's Br. at 56 (emphasis added); see also id. ("Nor would it have been sensible for [taxpayer] to use a compensation plan that shared [its] _profits_ with its independent contractors as the Tax Court appeared to suggest." (emphasis added)).) In his opening statement at trial, the Commissioner's counsel stated

> [Eberl] deserves the millions of dollars that he received from [taxpayer] during the years at issue.
> . . .
> [T]here's no question here that [taxpayer] has the right to pay whatever it wants to Mr. Eberl. The only question here, of course, is whether or not the company may deduct the amounts paid.

(I Trial Tr. at 6–7.) Perhaps persuaded by the Commissioner's argument that a company's "owner and shareholder [would] ordinarily reap the benefits" of an extraordinarily profitable year, not its employees, the Tax Court properly concluded that Eberl's salary was in fact a constructive dividend on which the company should have paid taxes. ( Id. at 14.)

4. Financial Condition

Noting that as taxpayer's revenues rose over the years, its profits remained relatively "tiny" and its retained earnings and taxable income stagnated, the court found taxpayer's financial condition favored the Commissioner. Eberl's Claim

- 14 -

Serv., slip mem. at 19–20. In its objection to the treatment of this factor, taxpayer argues that the Tax Court erroneously relied on surveys comparing taxpayer to companies not similarly situated.

Taxpayer advances a different scenario for our consideration. In its briefs, taxpayer points to its expert's testimony that the amounts paid to Eberl in 1992 and 1993 were reasonable, in which he compared Eberl to fifty of "the most highly compensated" insurance company chief executives as summarized in a Forbes magazine survey, while acknowledging that in the survey "we still do not have anyone that's in the claims adjusting field, as near as I can tell." (II Trial Tr. at 314, 315.) It was entirely proper for the Tax Court to reject the comparison between the companies on the Forbes list, which are probably "the very largest companies in the country" and some of whose CEOs are "way off the board in terms of compensation," and Eberl's relatively small, nonpublic company. ( Id. at 324, 315.)

The Commissioner's expert, on the other hand, testified that "bottom line net profit" is the principal measure of a company's performance and supplied a survey of pretax profits of comparable service companies. ( Id. at 390.) Given the disparity, it was not improper for the Tax Court to reject the testimony of one expert and rely on that of another. See Pepsi-Cola Bottling , 528 F.2d at 181 (holding the "credibility of witnesses, the weight of the evidence, and the

reasonable inferences to be drawn therefrom are for the Tax Court to determine").

5. Evidence Used to Determine a Reasonable Amount of Compensation

Similarly, the Tax Court properly relied on expert testimony when it determined the specific amounts that would have constituted reasonable compensation in 1992 and 1993.

Based on Carey's testimony that successful service companies comparable to taxpayer had pretax profits of ten percent of sales during the years in question, the court estimated that reasonable amounts of retained earnings would have been $2 million and $1 million, respectively, for fiscal years 1992 and 1993. According to those figures, reasonable compensation of Eberl would have been $2,340,000 and $1,080,000 in those two years. Taxpayer asserts that this amounted to the use of an "unprecedented hypothetical retained earnings test" rather than an analysis of the circumstances as a whole as required by our precedent. (Appellant's Br. at 42.) To the contrary, we conclude the court determined in light of all the evidence that Eberl's salary was unreasonably large, then relied on Carey's evidence of reasonable retained earnings to fix a reasonable amount.

While it is true that the court rejected some of Carey's data as invalid, taxpayer's contention that his data on imputed pretax profits were thereby

discredited is without merit.  Carey relied on two different surveys to determine comparable salaries and typical pretax profits, and the Tax Court permissibly determined the latter included comparable companies while the former did not. See Pepsi-Cola Bottling , 528 F.2d at 181.

## B.  The Independent Investor Test

In an argument raised for the first time on appeal, taxpayer asks this Court to adopt a new approach when determining reasonableness of compensation under I.R.C. § 162(a)(1).  Taxpayer asserts that while a multi-factor test of reasonableness has been employed in this Circuit in the past, "this Court has not expressly embraced such a test."  (Appellant's Br. at 25.)  It argues that this Court's opinion in   Pepsi-Cola Bottling   endorsed only the proposition that "the determination of reasonable compensation is based on the totality of the circumstances" but did not preclude future panels from revisiting the content of the reasonableness test.  (   Id. )

Specifically, taxpayer cites a recent "trend" in other Circuits toward the use of an "independent investor" test.  (    Id. at 26 (citing   Exacto Spring Corp. v. Comm'r , 196 F.3d 833, 838 (7th Cir. 1999) (rejecting a multi-factor approach to determining reasonableness of a salary and adopting an "independent investor" test); Dexsil Corp. v. Comm'r   , 147 F.3d 96, 100–01 (2d Cir. 1998) (applying an independent investor test and noting the test "is not a separate autonomous

factor; rather, it provides a lens through which the entire analysis should be viewed"); Rapco, Inc. v. Comm'r, 85 F.3d 950, 954–55 (2d Cir. 1996) (applying a multi-factor test "from the perspective of an independent investor"); Elliotts, 716 F.2d at 1245 (same).). We are urged to follow suit by setting aside the traditional multi-factor test of reasonable compensation in favor of some form of the independent investor test recently adopted by some of our sister Circuits.

The independent investor test approaches the issue of reasonableness by asking "whether an inactive, independent investor would be willing to compensate the employee as he was compensated." Elliotts, 716 F.2d at 1245; see also Exacto Spring, 196 F.3d at 839 ("When, notwithstanding the CEO's 'exorbitant' salary . . . the investors in his company are obtaining a far higher return than they had any reason to expect, his salary is presumptively reasonable."). In other words, a salary is entitled to a rebuttable presumption of reasonableness when a hypothetical outside investor in the company would earn a desirable rate of return. See Exacto Spring, 196 F.3d at 838 ("If the rate of return is extremely high, it will be difficult to prove that the manager is being overpaid, for [replacing the manager with a lower-paid manager] . . . would be killing the goose that lays the golden egg."). The independent investor test is an attractive solution because it is "much simpler and more purposive" than the

multi-factor approach, "return[ing] the inquiry to basics" by focusing on the disinterested investor's perspective.    Id.

Somewhat disingenuously, taxpayer argues that in    Pepsi-Cola Bottling  , "at no time did the Court state . . . that a multi-factor test was the proper method for assessing reasonable compensation."  (Appellant's Br. at 26 n.4.)  To the contrary,  Pepsi-Cola Bottling   establishes that this Court assesses reasonableness of compensation using a multi-factor test.  528 F.2d at 179.  Whatever the relative wisdom of the two approaches, absent en banc rehearing we are bound to the use of a multi-factor approach by our prior decision in    Pepsi-Cola Bottling  .[6]

---

[6] Further, of those Circuits that have embraced an independent investor test, only the Seventh has gone so far as to jettison the multi-factor approach entirely.  Others have merely committed to viewing the totality of the circumstances through the "lens" of, Dexsil Corp., 147 F.3d at 101, or "from the perspective of," Elliotts, 716 F.2d at 1245, a hypothetical outside investor.  Those Circuits have retained the totality of the circumstances approach that this Court embraced in Pepsi-Cola Bottling.

**III**

Taxpayer compensated Eberl "at a level that depleted it of virtually all of its profits." (Appellee's Br. at 25.) The Tax Court properly found that a large portion of Eberl's compensation was in fact a disguised dividend and should be taxed as such. Considering the record as a whole, we cannot say that the Tax Court's findings were clearly erroneous. The decision of the Tax Court is **AFFIRMED** .