T.C. Memo. 2001-262

UNITED STATES TAX COURT

B & D FOUNDATIONS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14973-98.                     Filed October 3, 2001.

<u>Joseph H. Thibodeau</u>, <u>Matthew T. Gehrke</u>, and

<u>Kandace C. Gerdes</u>, for petitioner.

<u>Michael W. Lloyd</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined the following

deficiencies in petitioner's Federal income tax:

| Year Ended | Deficiency |
|------------|------------|
| 7/31/93 | $24,142 |
| 7/31/96 | 98,279 |

Respondent disallowed as unreasonable compensation under section 162(a)(1)[1] $353,911 of salaries out of $1,113,800 paid and claimed by petitioner as salaries and bonuses to its officer-director-shareholders, William and Connie Myers, for its fiscal year ended July 31, 1996. We sustain respondent's determination.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated by this reference.

Petitioner is a Colorado corporation that pours concrete foundations of residential houses and light commercial buildings for real property developers, and provides other concrete "flat work", such as driveways, sidewalks, and basement and garage floors. When petitioner filed its petition, it maintained its principal place of business in Colorado. At all relevant times, petitioner has been taxable as a C corporation and reported its income and deductions, except for State income tax, on the cash method of accounting.

---

[1]All section references are to the Internal Revenue Code as in effect during the years in issue, and all Rule references are to the Tax Court's Rules of Practice and Procedure. The deficiency for the fiscal year ended July 31, 1993, is attributable to the reduction of a net operating loss carryback (claimed by petitioner from the fiscal year ended July 31, 1996) by reason of respondent's disallowance of a portion of the compensation deduction claimed by petitioner for the later year.

Since petitioner was incorporated in late 1986, William Myers, petitioner's president, and his wife Connie Myers, petitioner's vice president, secretary, and treasurer, have been its only officers, directors, and shareholders.

Mr. Myers has a high school education. After graduating from high school, Mr. Myers worked in the grocery business for approximately 12 years and was the manager of a grocery store. For the next 14 years, before petitioner's incorporation in late 1986, Mr. Myers worked in the construction industry on a variety of jobs related to the pouring of concrete for foundations and flat work: Delivering mixed concrete to construction sites as the driver of a Redi-Mix concrete truck, pouring concrete foundations and flat work for numerous building projects as a construction worker, foreman, or supervisor, and, beginning in 1983, managing his own foundation and flat work business in partnership with another individual (the B & D partnership).

Mrs. Myers has an associate's degree in computer science. She worked as a computer programmer and then became a licensed stockbroker. After petitioner's incorporation, she quit her job as a stockbroker to join Mr. Myers in managing petitioner. While working for petitioner, Mrs. Myers resumed her college education and obtained a bachelor's degree in business in 1990.

Following a downturn in construction in Colorado, Mr. Myers's partner sold his interest in the B & D partnership to Mr.

Myers and retired.  In late 1986, petitioner was incorporated to conduct the foundation and flat work contracting business previously operated by the B & D partnership and by Mr. Myers.

Upon incorporation of petitioner, Mr. and Mrs. Myers invested $10,000 in its capital stock; Mr. Myers received 51 percent of petitioner's outstanding shares of common stock, and Mrs. Myers received the other 49 percent.  Mr. and Mrs. Myers have owned these same stock interests throughout petitioner's existence (including the year in issue, ended July 31, 1996).

Mr. and Mrs. Myers also made advances to petitioner of $77,237, which were shown on petitioner's books and income tax returns as debt.  The record does not show how the advances were divided between Mr. and Mrs. Myers or whether petitioner paid interest on them.  Petitioner paid off these advances over the first 4 years of its existence.

Since 1987, when petitioner began operations, Mr. and Mrs. Myers have played complementary roles as the only members of its management team.  Mr. Myers has handled all work in the field, and Mrs. Myers has maintained petitioner's books and provided all administrative support.  In 1987, petitioner employed about 10 construction workers.  Over the years, petitioner has employed up to 35 to 40 construction workers, depending on work volume.

Throughout petitioner's existence, Mr. Myers, during peak construction periods, has worked long hours to accomplish a

variety of tasks.  Mr. Myers schedules and coordinates petitioner's construction activities with various builders, other contractors, and suppliers.  Mr. Myers manages and supervises petitioner's construction workers and is responsible for all construction work done by petitioner.  He exclusively solicits, bids, and obtains jobs for petitioner.

For each job petitioner obtains, Mr. Myers orders and arranges for delivery of the premixed concrete to the construction site.[2]  He orders and arranges for all necessary equipment and supplies.  He often supervises the actual work by petitioner's workers at the site.  When Mr. Myers cannot be present to supervise the work at a site, he assigns an experienced and responsible construction worker of petitioner to act as foreman of the work crew.[3]

On workdays during peak periods, Mr. Myers typically spends most of his time in the field attending to and supervising

[2]Petitioner does not perform the excavation work needed to lay the foundation of a building.  Another contractor performs all required excavation work.  After excavation is completed, Mr. Myers examines the excavated building site and determines the quantity of mixed concrete to be delivered to lay the foundation. To avoid running short of mixed concrete during pouring, he orders more than the minimum quantity he estimates is needed to lay the foundation.  To minimize waste from ordering excess mixed concrete, where petitioner is constructing a number of foundations at sites in close proximity, such as the home foundations in a subdivision, Mr. Myers tries to schedule the pouring of several foundations per day.

[3]During the fiscal year ended July 31, 1996, petitioner employed three individuals who served as foremen.

petitioner's construction activities and marketing its services to builders. On workday evenings after he returns home or on weekends, he informs and discusses with Mrs. Myers, among other things, the amounts to bill the builders for petitioner's work on their jobs, petitioner's payment obligations for equipment and supplies, and petitioner's weekly payroll for construction workers, and he also works on bids he intends to submit to builders on petitioner's behalf.

Mr. and Mrs. Myers have always maintained petitioner's office in their home. Before petitioner's incorporation, they resided in Greeley, Colorado, approximately 50 miles north of Denver.[4] In early 1987, shortly after petitioner's incorporation, Mr. Myers decided to seek contracting work for petitioner in Highlands Ranch, Colorado, approximately 20 to 30 miles south of Denver, where a number of large residential subdivisions were being developed. However, it took Mr. Myers some time to establish the reputation with the builders in Highlands Ranch that enabled him to obtain substantial work from

---

[4]Originally, the B & D partnership had been operating in the Boulder, Longmont, and north Denver areas. After construction work declined in those areas in the mid-1980's, Mr. Myers had obtained contracting jobs for the B & D partnership in Colorado Springs, approximately 120 miles from his home in Greeley. For several years, he spent many of his nights during the workweek at an apartment, motel or mobile home in Colorado Springs and would often see Mrs. Myers only on weekends. However, by early 1987, construction work in Colorado Springs had also started to decline following the Space Shuttle disaster.

them for petitioner.  During this interim period, Mr. Myers continued to commute from Greeley to Colorado Springs while finishing the jobs petitioner had there.

By 1990, Mr. Myers and petitioner began to enjoy a good reputation among home builders and other construction industry people in the Denver metropolitan area, particularly in Douglas County (which includes Highlands Ranch).  Mr. Myers and petitioner had become well known for doing high-quality foundations and flat work efficiently, reliably, and on schedule. This reputation enabled petitioner to obtain more business and increase its gross receipts and profits.  Although petitioner's bids had to be competitive, petitioner did not always have to be the lowest bidder to obtain work from the builders.

In the latter part of 1990, Mr. and Mrs. Myers moved their home (and petitioner's office) to Castle Rock, Colorado, which is located about 40 miles south of Denver and 20 miles from Highlands Ranch.

From 1986 through 1996, a substantial number of new houses were built in Douglas County.  The rate of annual increase in new houses built in Douglas County slightly declined from 1986 through 1990, going from 11 percent for 1986 to 6.5 percent for 1990.  This slight decline ended in 1991; according to U.S. Census Bureau information, from 1990 through 1998 Douglas County was the fastest growing county in the nation, in terms of

population increases.  For 1996, the rate of increase in the number of new houses built in Douglas County was 14.8 percent.

In 1995, petitioner became a contractor for Kaufman & Broad, a national home building company then building numerous houses in Highlands Ranch.  During the fiscal year ended July 31, 1996, petitioner laid more than 600 foundations, of which approximately 500 were for Kaufman & Broad.

Over the period from January 1, 1987 (when petitioner began operations), through July 31, 1996, petitioner made annual payments as compensation to Mr. and Mrs. Myers and to petitioner's construction workers as set forth below.[5]

| FYE July 31 | William Myers | Connie Myers | Total Officer Comp. | Total Construction Worker Comp. |
|---|---|---|---|---|
| 1987 | $30,000 | $6,750 | $36,750 | $86,846 |
| 1988 | 54,500 | 12,950 | 67,450 | 216,394 |
| 1989 | 43,000 | 15,050 | 58,050 | 191,414 |
| 1990 | 83,000 | 29,650 | 112,650 | 269,681 |
| 1991 | 173,600 | 12,500 | 186,100 | 374,135 |
| 1992 | 165,000 | 65,000 | 230,000 | 425,413 |
| 1993 | 457,785 | 156,000 | 613,785 | 535,051 |
| 1994 | 630,750 | 271,750 | 902,500 | 592,977 |
| 1995 | 455,000 | 247,500 | 702,500 | 675,671 |
| 1996 | 749,500 | 364,300 | 1,113,800 | 679,437 |

The total compensation of $1,113,800 paid Mr. and Mrs. Myers for the fiscal year in issue ended July 31, 1996, was divided between salaries and bonuses as follows:

---

[5]The allocation  of officers' compensation between salary and bonus for each year is set forth infra in the appendix.

|           | Mr. Myers | Mrs. Myers | Totals |
|-----------|-----------|------------|--------|
| Salaries  | $586,500  | $288,500   | $875,000 |
| Bonuses   | 163,000[1] | 75,800[2]  | 238,800 |
| Totals    | 749,500   | 364,300    | 1,113,800 |

[1]Of this $163,000, $125,000 was said to be a bonus for fiscal year 1995 and $38,000 a bonus for fiscal year 1996.
[2]Of this $75,800, $58,000 was said to be a bonus for fiscal year 1995 and $17,800 a bonus for fiscal year 1996.

As described infra pp. 10-11, 13, petitioner also made contributions on behalf of Mr. and Mrs. Myers to a qualified retirement plan and further agreed to make specified deferred compensation payments to each of them.

Petitioner had no fixed formula for determining the annual salaries and bonuses paid to Mr. and Mrs. Myers. Until the fiscal year ended July 31, 1996, Mr. and Mrs. Myers, petitioner's directors, generally around the beginning of the fiscal year, would set the respective salaries they were to receive for that year. At the same time, they would authorize Mr. Myers, as petitioner's president, to pay himself and Mrs. Myers whatever raises, fringe benefits, and bonuses that he considered appropriate for that year. For example, concerning the respective salaries and bonuses paid to Mr. and Mrs. Myers for the fiscal year ended July 31, 1995, the minutes of petitioner's

annual directors' meeting of August 8, 1994, stated, in pertinent

part:

> The Corporation has experienced continued
> financial growth due almost entirely to the
> efforts of William Myers and Connie Myers.
> The Board of Director's [sic] wishes to
> compensate the Officers for a job well done.
>
> Upon motion duly made, seconded and unanimously
> approved, the Corporation shall pay the following
> officers' salaries for the fiscal year end July 31,
> 1995:
>
>> William L. Myers, President      $100,000
>> Connie J. Myers, Secretary         60,000
>
> The President is also authorized to approve whatever
> raises, fringe benefits and bonuses he judges to be
> fair.

For the fiscal year ended July 31, 1996, the Memorandum of

Action of the directors with respect to the compensation of Mr.

and Mrs. Myers speaks as of the end of the fiscal year.

Specifically, the Memorandum of Action states as follows

concerning the respective salaries and bonuses of Mr. and Mrs.

Myers, the contribution for that year to a qualified retirement

plan for their benefit, and the deferred compensation agreements

being entered into with them:

> We, all the Directors of B & D FOUNDATIONS, INC.,
> a Colorado corporation, pursuant to Section 7-108-202
> of the Colorado Business Corporation Act, take the
> following action(s), by consent and without a meeting,
> as if by unanimous vote, and waive all notice of such
> meeting pursuant to Section 7-108-203 of that Act:
>
>      *     *     *     *     *     *     *

2. <u>Deferred Compensation Agreement</u>.  The Directors, after exhaustive review of the officers' compensation and the shareholders' returns since the Company was founded, have determined that the Officers have been substantially undercompensated since the Company's inception.  Therefore, after recognition of a substantial return to the Shareholders on their investment in the Company, the Directors have determined to provide the Officers deferred compensation in consideration of their past services rendered.  The Deferred Compensation Agreements between this Corporation and William Myers and between the Corporation and Connie Myers, copies of which are included in the Corporation's minute book, are hereby approved.  The Officers of this Corporation are authorized to execute and perform those Agreements on behalf of this Corporation.

3. <u>Ratification of Defined Benefit Plan</u>.  The Board of Directors hereby ratifies and approves of the actions taken by the Officers of this Corporation in adopting a Qualified Defined Benefit Retirement Plan, copies of which are included in this Corporation's minute book.

4. <u>Contributions to Qualified Plans</u>.  The Board of Directors hereby ratifies and approves the contribution of $92,600.00 to the trustee of the B & D Foundations, Inc. Employee Retirement Defined Benefit Plan.

5. <u>Salaries</u>.  The Board of Directors hereby acknowledges that it reached a settlement in calendar year 1996 with the Internal Revenue Service respecting officers' compensation for fiscal years ending 1993 and 1994.  In accordance with the guidelines established by the Internal Revenue Service[6] in reaching this

---

[6]Pursuant to that settlement, petitioner agreed to treat as constructive dividend income $108,830 of the total compensation paid to Mr. and Mrs. Myers for the 1993 fiscal year and $57,533 of the total compensation paid to them for the 1994 fiscal year. However, the record discloses no specific guidelines or compensation formula that had been applied by the parties in determining the amounts deductible by petitioner as reasonable compensation to Mr. and Mrs. Myers under this settlement.  The

(continued...)

settlement and after effecting an inflation increase for 1996, the following salaries, and the bonuses set forth in paragraph 6 below, are hereby fixed for the following Officers until further action of the Board.

    William L. Myers        $586,500
    Connie J. Myers         $288,500

6. Payment of Bonus.  The Board of Directors hereby authorize and direct the Officers of this Corporation to pay bonuses for the fiscal years ended July 31, 1995 and 1996, to the following Officers in the amounts set opposite their names:

|  | Total | 1995 | 1996 |
|---|---|---|---|
| William L. Myers | $163,000 | $125,000 | $38,000 |
| Connie J. Myers | $ 75,800 | $ 58,000 | $17,800 |

    *    *    *    *    *    *    *

This consent of the Board of Directors when signed by all of the Directors of this corporation shall have the same effect as having been unanimously adopted by vote of the Board of Directors of this Corporation on the 31st day of July, 1996.[7] The Directors of this Corporation are as follows:

Approved:

DIRECTORS:

_____

[6](...continued) Income Tax Examination report dated Apr. 18, 1998, of the revenue agent who examined petitioner's return for the fiscal year ended July 31, 1996, stated that "The settlement [for the earlier 1993 and 1994 fiscal years] is not specific as to how a reasonable compensation amount was determined."  Indeed, petitioner now acknowledges no formula was used in settling those 1993 and 1994 tax years.

[7]The record does not disclose the date on which petitioner's directors, Mr. and Mrs. Myers, had signed the Memorandum of Action.  Respondent did not question whether the salaries and bonuses authorized by the Memorandum, which petitioner deducted on its return for the year ended July 31, 1996, were actually paid to Mr. and Mrs. Myers during that year.

/s/ William L. Myers
William L. Myers

/s/ Connie J. Myers
Connie J. Myers

Petitioner agreed, in the Deferred Compensation Agreements referred to in paragraph 2 of the Memorandum of Action, to pay Mr. Myers $362,000 and to pay Mrs. Myers $126,000, as deferred compensation. Petitioner agreed to make the deferred compensation payments in equal monthly installments over a 60-month period beginning 1 month after: (1) The sale or exchange (through merger or otherwise) of more than 50 percent of petitioner's outstanding shares of stock; (2) the sale or exchange of all or substantially all of petitioner's assets (other than in the ordinary course of business); or (3) termination of employment with petitioner.

Petitioner's income tax returns for the fiscal years ended July 31, 1987, through 1996, disclose the following annual gross receipts and net profit or net loss after taxes:

| FYE July 31 | Gross Receipts | Net Profit (Net Loss) After Taxes |
|---|---|---|
| 1987 | $423,897 | $18,317 |
| 1988 | 856,623 | 60,729 |
| 1989 | 742,876 | 39,657 |
| 1990 | 978,152 | 38,632 |
| 1991 | 1,407,191 | 53,684 |
| 1992 | 2,053,999 | 3,274 |
| 1993 | 3,247,464 | 61,521 |
| 1994 | 3,289,189 | 193,624 |
| 1995 | 3,638,980 | 59,292 |
| 1996 | 4,561,878 | (61,904) |

The Schedule L--Balance Sheets included in petitioner's income tax returns for these years further reflect the following total assets and net assets and equity (without regard to petitioner's obligation to make future payments to Mr. and Mrs. Myers or to respondent's contention that the $77,237 of advances should be treated as equity):

| FYE July 31 | Total Assets[1] | Net Assets/ Equity[2] |
|---|---|---|
| 1987 | $131,216 | $31,405 |
| 1988 | 182,088 | 101,931 |
| 1989 | 207,373 | 134,073 |
| 1990 | 218,956 | 172,011 |
| 1991 | 254,634 | 218,462 |
| 1992 | 255,443 | 221,554 |
| 1993 | 361,949 | 282,989 |
| 1994 | 591,366 | 475,808 |
| 1995 | 547,656 | 534,443 |
| 1996 | 378,684 | 378,542 |

[1]Petitioner's cost for the assets, less accumulated depreciation.
[2]Total assets, less liabilities, which equals capital stock of $10,000, plus retained earnings.

From incorporation in late 1986 through July 31, 1996, petitioner declared and paid no formal dividends.

Around 1994, Mr. and Mrs. Myers decided they would no longer seek to increase the size of petitioner's business. Shortly thereafter, Mr. Myers helped his son, Kurt Myers (Kurt), establish another foundation and flat work construction company, Myers Foundations, Inc. (Myers Foundations). Mr. Myers owned 51 percent of the outstanding shares of stock of Myers Foundations and Kurt owned the other 49 percent. Mr. Myers served as vice

president of Myers Foundations.  On July 31, 1996, Mr. Myers'
stock interest in Myers Foundations was redeemed, and Kurt became
its sole shareholder.

Mr. Myers also helped Bill Collins, a former employee of
petitioner and the B & D partnership, establish Collins Concrete
Construction, Inc. (Collins Concrete), another foundation and
flat work construction company.  Mr. Collins and Mr. Myers
together owned Collins Concrete.  By 1996, Mr. Myers' entire
stock interest in Collins Concrete had been redeemed.

During 1996, Mr. Myers also engaged in certain cattle
breeding and feeding activities and horse breeding and showing
activities.

In the notice of deficiency, respondent disallowed
petitioner's deduction of $353,911 of the $875,000 of salaries
paid Mr. Myers and Mrs. Myers for its fiscal year ended July 31,
1996, but did not make any adjustment to the $238,000 of bonuses
paid for that year and the preceding year.  The notice of
deficiency stated, in pertinent part:

> Issue A: Whether the compensation paid to the
> shareholder/officers of the corporation are reasonable
> given the duties and services provided to the company.
>
> Reconciliation:      FYE 7/31/96
>  Per Return       [$]1,113,800
>  Per Exam            759,889
>
>  Adjustment          353,911
>
> The total "reasonable" compensation amount was
> determined as follows:

| | |
|---|---:|
| Chief Executive Officer | [$]186,420 |
| Chief Financial Officer | 59,150 |
| Chief Operations/Administrative Officer | 162,095 |
| Marketing Executives | 113,424 |
| | 521,089 |

| | | |
|---|---:|---|
| Bonus (no adjustment to amount paid by TP as bonuses) | 183,000 | FY 7/95 |
| | 55,800 | FY 7/96 |
| Total compensation allowed | 759,889 | |

OPINION

This is yet another case in which a closely held C corporation--whose shareholders have never elected pass-through treatment under subchapter S--faces the burden of justifying the deductibility for U.S. corporation income tax purposes of amounts paid to them as compensation that respondent claims to be unreasonable and excessive.

Section 162(a)(1) allows as a business deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered". A two-prong test determines the deductibility of payments as compensation: (1) Whether the amount claimed to be deductible as compensation is reasonable in relation to services performed, and (2) whether the payment is in fact purely for services rendered. Sec. 1.162-7(a), Income Tax Regs. Bonuses paid to employees are deductible "when * * * made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a

reasonable compensation for the services rendered." Sec. 1.162-9, Income Tax Regs.[8] Generally, courts have focused on the reasonableness requirement in determining deductibility. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1244 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.

The reasonableness of compensation is a question of fact to be answered by considering all facts and circumstances of the particular case. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974); Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). Petitioner has the burden of showing that the amount it deducted as compensation was reasonable, and that it is entitled to a compensation deduction larger than that allowed by respondent. Rule 142(a); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra at 179; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361 (9th Cir. 1974), affg. T.C. Memo. 1971-200.[9]

---

[8]In the notice of deficiency, respondent did not adjust the $238,000 of bonuses paid to Mr. Myers and Mrs. Myers for the 1995 and 1996 fiscal years that petitioner deducted on its fiscal year 1996 return. However, the total compensation that was paid to Mr. and Mrs. Myers during the 1996 fiscal year in issue included these bonuses. Accordingly, in evaluating the reasonableness of the salaries petitioner paid and deducted for Mr. Myers and Mrs. Myers, we consider the total compensation they received, including bonuses.

[9]The Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. 105-206, sec. 3001(a), 112 Stat. 685, 726-727, enacted sec. 7491 to shift the burden of proof to respondent
(continued...)

Compensation paid by a corporation whose stock is closely held (as in the case at hand) is to be given special scrutiny. Elliotts, Inc. v. Commissioner, supra at 1243; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra at 179. As the Court of Appeals for the Ninth Circuit has explained, a closely held corporation will normally have an interest to characterize payments to a shareholder-employee as deductible compensation, rather than as nondeductible dividends, and the shareholder-employee and corporation are likely not to be dealing at arm's length. Elliotts, Inc. v. Commissioner, supra. The problem of determining whether a purported compensation payment is actually a disguised dividend, the Court of Appeals further noted, is aggravated when a shareholder-employee is the corporation's sole shareholder. An employee who is sole shareholder not only has complete control over the corporation's operations but is the only eligible dividend recipient. Id.

Case law has provided an extensive list of factors that are relevant in determining reasonable compensation. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court.

[9](...continued)
in court proceedings under certain circumstances. However, sec. 7491 generally applies and is effective only to court proceedings arising in connection with examinations commencing after July 22, 1998, and is not applicable to this case. RRA sec. 3001(c)(1), 112 Stat. 727. Respondent's examination of petitioner's return for the fiscal year ended July 31, 1996, began well before July 22, 1998.

No single factor is dispositive.  Pac. Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980).

In Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra at 179, the Court of Appeals for the Tenth Circuit, to which this case is appealable, listed nine factors to be considered, with the situation as a whole being considered and no single factor being decisive.  These nine factors are:  (1) The employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the business; (4) a comparison of salaries paid with the gross income and the net income; (5) the prevailing economic conditions; (6) a comparison of salaries with distributions to shareholders; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the salary policy of the taxpayer as to all employees; and (9) in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years.

Petitioner contends it has established the reasonableness of the compensation it paid to Mr. Myers and Mrs. Myers and deducted for its fiscal year ended July 31, 1996.  Respondent contends to the contrary that petitioner has failed to establish its right to a larger compensation deduction than respondent allowed in the notice of deficiency.

In their post-trial briefs, the parties have addressed in cursory fashion the independent investor test used by the Courts of Appeals for the Second,[10] Seventh,[11] and Ninth Circuits.[12]

In Eberl's Claim Serv., Inc. v. Commissioner, 249 F.3d 994, 1003-1004 (10th Cir. 2001), affg. T.C. Memo. 1999-211, the Court of Appeals for the Tenth Circuit recently confirmed that it continues to use the multifactor approach of Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra.  In Eberl's Claim Serv., Inc., the panel rejected the taxpayer's argument for adoption of some form of the independent investor test (more fully discussed infra pp. 47-57), stating that it was bound to continue using the multifactor approach of Pepsi-Cola Bottling Co. of Salina, Inc., absent reconsideration and adoption in an en banc rehearing.  Id.

In all likelihood, any appeal from our decision in the case at hand would be to the Court of Appeals for the Tenth Circuit. Sec. 7482(b)(1)(B).  As a result, in deciding this case, we follow its decisions in Eberl's Claim Serv., Inc., supra, and

---

[10]E.g., Dexsil Corp. v. Commissioner, 147 F.3d 96 (2d Cir. 1998), vacating and remanding T.C. Memo. 1995-135; Rapco, Inc. v. Commissioner, 85 F.3d 950 (2d Cir. 1996), affg. T.C. Memo. 1995-128.

[11]E.g., Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. T.C. Memo. 1998-220.

[12]E.g., Labelgraphics, Inc. v. Commissioner, 221 F.3d 1091 (9th Cir. 2000), affg. T.C. Memo. 1998-343; Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.

Pepsi-Cola Bottling Co. of Salina, Inc., supra, and apply the multifactor approach.  See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

Petitioner argues, among other things, that its compensation payments to Mr. Myers and Mrs. Myers for the 1996 fiscal year were reasonable because their efforts enabled it to enjoy outstanding financial performance from January 1, 1987, through July 31, 1996.  Petitioner claims, in light of its alleged outstanding financial performance, that an independent investor would have approved the compensation paid to Mr. Myers and Mrs. Myers.  Not surprisingly, respondent disputes petitioner's claims.  In applying the multifactor approach of the Court of Appeals for the Tenth Circuit, whether petitioner's owners enjoyed a high rate of return on their equity investment is a relevant factor.  The return on equity analysis (which, as discussed infra pp. 48-50, is central to the independent investor test) can be especially useful in evaluating the taxpayer's financial performance, an additional factor this Court addressed in Eberl's Claim Serv., Inc., supra.[13]

---

[13]In Eberl's Claim Serv., Inc. v. Commissioner, 249 F.3d 994, 999 (10th Cir. 2001), affg. T.C. Memo. 1999-211, the Court of Appeals noted that under the traditional multifactor approach in Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d 176 (10th Cir. 1975), affg. 61 T.C. 564 (1974), the situation must be considered as a whole, with no one factor being decisive.  It further noted that while the factors to be considered have been stated innumerable times in past cases, those factors have never been reduced to a definitive list.  Id.

(continued...)

Accordingly, in determining whether the amounts petitioner paid to Mr. and Mrs. Myers and deducted on its income tax returns were reasonable compensation, we first analyze and apply the nine factors used by the Court of Appeals for the Tenth Circuit in Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra. We then evaluate petitioner's financial performance using certain elements of the independent investor test.

A.  Mr. Myers' and Mrs. Myers' Qualifications

An employee's superior qualifications for his or her position may justify high compensation.  Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158.

Mr. Myers had substantial knowledge and experience in doing concrete work in the construction industry.  Before petitioner's incorporation in late 1986, Mr. Myers already had extensive experience in pouring concrete foundations and flat work, and in managing and operating his own foundation and flat work contracting business.

Mrs. Myers had almost no experience in the construction industry before she began to work for petitioner.  She had some

[13](...continued)
Indeed, in reviewing and affirming our decision in Eberl's Claim Serv., Inc., the Court of Appeals observed that this Court, in concluding that the taxpayer in that case had not carried its burden of showing the entire amount of compensation deducted was reasonable, had identified and examined 12 relevant factors, including, where the employee and employer have failed to deal at arm's length, whether an independent investor would have approved the compensation.  Id.

familiarity with general business matters and with office and administrative support functions, having previously worked as a computer programmer and stockbroker. After joining Mr. Myers in managing petitioner, she obtained a bachelor's degree in business in 1990.

This factor favors petitioner with respect to Mr. Myers but is neutral with respect to Mrs. Myers.

B.   The Nature, Extent, and Scope of Mr. and Mrs. Myers's Work

An employee's position, hours worked, duties performed, and general importance to the success of the business may justify high compensation. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158.

Mr. Myers was petitioner's key employee and driving force from its inception, and his personal services were essential to its success. He managed and built up petitioner's business, solicited and obtained all petitioner's jobs, and supervised and was responsible for all work performed.

On brief, respondent argues that, by the year ended July 31, 1996, Mr. Myers had substantially reduced the hours per week he worked for petitioner, and was devoting a substantial percentage of his time to the businesses of Myers Foundations and Collins Concrete. In doing so, respondent relies heavily on a tax return filed for the same period by Myers Foundations, the foundation and flat work construction company that Mr. Myers and his son

Kurt established in March 1994. This return (signed by Mr. Myers as vice president of Myers Foundations) reflects that Mr. Myers that year was paid $155,200 in compensation. The return further specifically states that Mr. Myers devoted 50 percent of his time to the business of Myers Foundations.[14] Although that return statement by Mr. Myers supports respondent's contention, we are satisfied that petitioner has adequately explained and disproved that statement.

Mr. Myers and Kurt testified that Kurt had previously worked for petitioner and the B & D partnership, and had already been trained by Mr. Myers during his prior employment with petitioner and the partnership. Mr. Myers testified that he did not actually devote more than about 1 percent of his overall time to Myers Foundations during its and petitioner's respective 1996 fiscal years. Similarly, Kurt testified that his father's work for Myers Foundations consisted of his consulting with Kurt over the telephone.

---

[14]The record further reflects that Mr. Myers received $324,000 of reported compensation from Collins Concrete (the other foundation and flat work construction company he owned together with Bill Collins) during 1995.

We found Mr. Myers's and Kurt's testimony credible.[15]  As determined in our findings, over the years, Mr. Myers has worked long hours to accomplish the numerous duties and tasks he performs for petitioner.  He and other witnesses further convincingly testified that he each year (including during petitioner's year ended July 31, 1996) puts in numerous workdays of 10 hours or more.[16]  He also has often worked on weekends and

_____

[15]We questioned Mr. Myers closely about the statement in the fiscal year ended July 31, 1996, return of Myers Foundations that he had devoted 50 percent of his time to its business.  Although he maintained the statement was untrue, he did not recall how that 50-percent figure had been arrived at by the accountant who had prepared that return.  We note that this accountant had also prepared petitioner's return for its year ended July 31, 1996, and that return stated that Mr. Myers had devoted 100 percent of his time to petitioner's business.

[16]During peak construction periods, Monday through Friday is the normal workweek for petitioner's construction workers.  Although petitioner does not pour concrete on Saturdays, some of its workers may work on Saturday to prepare or finish work on a particular building site.  On a typical workday, petitioner's construction workers report to a staging area by 7 a.m.  Mr. Myers is usually at the staging area around 6:30 a.m., in order to plan and direct the work to be done that day.  From the staging area, after picking up and loading any equipment and supplies needed in the work that day (panels, i.e., rectangular aluminum forms, form oil, anchor bolts, wall ties, etc.) Mr. Myers and petitioner's work crews proceed to various construction sites.  Petitioner's work crews normally work until 4:30 p.m. or 5 p.m., although they sometimes may be required to work until 7 p.m. or 8 p.m.  After petitioner's construction workers have stopped work, Mr. Myers usually has other tasks to perform, including preparing petitioner's billings, its weekly payroll, and its bids on future jobs, and planning construction activities for the next workday.

has not taken extended vacations, because he must see that all of petitioner's work is done.[17]

We similarly reject respondent's suggestion that Mr. Myers by the 1996 fiscal year was no longer putting in long hours for petitioner because of his cattle breeding and feeding and horse breeding and showing activities.

Mrs. Myers is petitioner's only office worker. She has played a complementary role to Mr. Myers by handling petitioner's accounting, administrative, and support functions.[18]

This factor favors petitioner with respect to Mr. Myers but is neutral with respect to Mrs. Myers.

### C. The Size and Complexities of Petitioner's Business

The size and complexity of a taxpayer's business is considered in determining whether compensation is reasonable. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d at 179.

---

[17]Petitioner's volume of work generally fluctuates during the year. In the Denver metropolitan area, the peak periods of construction include May, June, September and October. Notwithstanding fluctuations in petitioner's workload, Mr. Myers tries to schedule and have petitioner undertake some contracting jobs throughout the year, in order to provide steady work for some of his better workers. Because winter temperatures in the Denver metropolitan area generally do not fall below freezing, concrete can usually be poured throughout the year.

[18]Although Mrs. Myers was not a shareholder or officer of Myers Foundations, she kept its books and prepared its payroll during its fiscal year ended July 31, 1996. During that year, Myers Foundations maintained its office in the home of Mr. and Mrs. Myers.

As indicated in our findings, around 1994 Mr. and Mrs. Myers had decided not to seek to increase the size of petitioner's business. At that point, petitioner had reached the maximum size they felt comfortable managing and operating. If petitioner's contracting business had expanded substantially, Mr. Myers would no longer have been able to manage and be personally responsible for all of petitioner's construction work. Mr. and Mrs. Myers further believed it would be difficult to find and hire qualified additional employees to perform any of the same functions as Mr. Myers. At any rate, they were unwilling to make the substantial additional financial commitment needed if petitioner were to attempt to grow substantially, particularly since petitioner at this time had relatively little debt. Indeed, as respondent's expert suggested, petitioner's contracting business was similar to other small, family-owned-and-run construction contracting businesses, distinguished from them only by its relatively outstanding ability to generate funds to pay dividends and compensation to its shareholders.

Petitioner grossed more than $3.2 million annually from its foundation and flat work construction business for its 1993 through 1995 fiscal years. For the 1996 fiscal year in issue, petitioner grossed more than $4.5 million and poured more than 600 foundations. It has employed up to as many as 35 to 40 construction workers during a year. Mr. and Mrs. Myers were the only members of petitioner's management team and performed

multiple roles in managing petitioner's operations.

Petitioner's jobs did not require substantial scientific and highly technical knowledge. Miller Box, Inc. v. United States, 488 F.2d 695, 705 (5th Cir. 1974) (wooden ammunition box manufacturing operation was simple); Tricon Metals & Servs., Inc. v. Commissioner, T.C. Memo. 1997-360; cf. Choate Constr. Co. v. Commissioner, T.C. Memo. 1997-495 (taxpayer specialized in constructing complex projects such as hospital operating rooms, robotics facilities, high-quality glass-making plants, and industrial "clean rooms").

This factor favors respondent, but the advantage to respondent is substantially offset by the leanness of petitioner's management team and the multiple functions Mr. and Mrs. Myers performed in managing petitioner's operations. See PMT, Inc. v. Commissioner, T.C. Memo. 1996-303 (noting that courts have considered the recipient-employee's performance of more than one function for the employer); see also Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343, affd. 221 F.3d 1091 (9th Cir. 2000).

D. Comparison of Mr. and Mrs. Myers's Salaries and Bonuses With Petitioner's Gross Receipts and Net Income or Net Loss After Taxes

Although it is often helpful to consider compensation as a percentage of both gross receipts and net income, net income is usually more important, because it more accurately gauges whether a corporation is disguising the distribution of dividends as

compensation. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325-1326 (5th Cir. 1987), affg. T.C. Memo. 1985-267. However, no particular ratio between compensation and gross or net taxable income is a prerequisite for a finding of reasonableness. Id. at 1326.

Over the period January 1, 1987, through July 31, 1996, petitioner had the annual gross receipts and net income (before taxes and officer compensation)[19] set forth below.

| FYE July 31 | Gross Receipts | Net Income |
| --- | --- | --- |
| 1987 | $423,987 | $58,299 |
| 1988 | 856,623 | 141,745 |
| 1989 | 742,876 | 104,705 |
| 1990 | 978,152 | 158,100 |
| 1991 | 1,407,191 | 251,012 |
| 1992 | 2,053,999 | 233,852 |
| 1993 | 3,247,464 | 689,195 |
| 1994 | 3,289,189 | 1,192,457 |
| 1995 | 3,638,980 | 778,656 |
| 1996 | 4,561,878 | 1,051,896 |

From January 1, 1987 through July 31, 1996, the annual compensation paid Mr. and Mrs. Myers represented the percentages of petitioner's gross income and net income (before taxes and officer compensation) set forth below:

---

[19]The net income figure given for the fiscal year ended July 31, 1996, is net of the $92,681 that petitioner contributed to the qualified retirement plan it established for petitioner's employees that year. No breakdown is available as to the portion of the $92,681 contribution that would benefit Mr. and Mrs. Myers as opposed to petitioner's other employees. The record does reflect that Mr. and Mrs. Myers were among the employees who would benefit under the plan. It is thus likely that most, if not substantially all, of the contribution would benefit them.

| FYE July 31 | Total Officer Compensation | Percentage of Gross Income | Percentage of Net Income |
|---|---|---|---|
| 1987 | $36,750 | 8.67 | 63.04 |
| 1988 | 67,450 | 7.87 | 47.59 |
| 1989 | 58,050 | 7.81 | 55.44 |
| 1990 | 112,650 | 11.52 | 71.25 |
| 1991 | 186,100 | 13.22 | 74.14 |
| 1992 | 230,000 | 11.20 | 98.35 |
| 1993 | 613,785 | 18.90 | 89.05 |
| 1994 | 902,500 | 27.44 | 75.68 |
| 1995 | 702,500 | 19.30 | 90.22 |
| 1996 | 1,113,800 | 24.42 | 105.88 |

For the 1996 fiscal year in issue, petitioner had a net loss after taxes of $61,904 as a result of the $586,500 salary and $163,000 bonus paid to Mr. Myers and the $288,500 salary and $75,800 bonus paid to Mrs. Myers. These payments equaled 105.88 percent of petitioner's net income for that year (before taxes and officer compensation). Petitioner that year also experienced a $155,901 reduction in its equity ($534,443 net assets and equity at the beginning of the year, less $378,542 net assets and equity at yearend, without regard to the obligation petitioner took on in that year to pay an additional $488,000 of "deferred compensation" to Mr. and Mrs. Myers).

Respondent's expert acknowledged that Mr. and Mrs. Myers were undercompensated during petitioner's early years of operation. However, as discussed more fully infra pp. 43-47, respondent and petitioner disagree over whether Mr. Myers and Mrs. Myers remained underpaid for their past services in prior

years as of the beginning of petitioner's fiscal year ended July 31, 1996.

This factor favors respondent.

### E. Economic Conditions

If general economic conditions are favorable, they may downgrade the extent of the employee's effect on the company's performance. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119-120 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court.

The record reflects the construction boom in Douglas County from 1990 through 1996. Indeed, with some help and guidance from Mr. Myers, Myers Foundations and Collins Concrete, two other foundation and flat work contracting companies that he helped establish, were able to operate successfully and obtain substantial business during 1995 and 1996.

Although the construction boom in Douglas County contributed to petitioner's profitability during these years, the record also reflects that petitioner was a well managed company whose work enjoyed an excellent reputation among builders and other construction industry people in the Denver, Colorado, area.

This factor is neutral because petitioner's financial success was not due merely to fortuitous economic conditions. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1158; Neils v. Commissioner, T.C. Memo. 1982-173.

F. Comparison of Salaries and Bonuses Petitioner Paid
   Mr. and Mrs. Myers With Formal Dividend Distributions

The failure to declare and pay dividends suggests that purported compensation payments may be disguised dividends. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 153 (8th Cir. 1974), affg. T.C. Memo. 1973-130.

Although Mr. and Mrs. Myers were extremely well compensated, commencing with petitioner's fiscal year ended July 31, 1993, petitioner made no formal dividend distributions from the time of its incorporation in late 1986 through July 31, 1996.

This factor favors respondent.

G. Prevailing Rates of Compensation for Comparable
   Positions in Comparable Concerns

In deciding whether compensation to an employee is reasonable, we compare it to compensation paid to persons holding comparable positions in comparable companies. Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119; sec. 1.162-7(b)(3), Income Tax Regs. In assessing this factor, we consider the testimony of the parties' expert witnesses. As trier of fact, we are not bound by the opinion of any expert witness and will accept or reject expert testimony, in whole or in part, in the exercise of sound judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976) (and cases cited therein), affg. T.C. Memo. 1974-285.

Petitioner's Expert

Petitioner's expert Lawrence P. Gelfond owns his own certified public accounting and business consulting firm. He has extensive experience in evaluating commercial enterprises for business decisions, and he has valued closely held businesses and professional practices.

Mr. Gelfond opined that the compensation petitioner paid to Mr. Myers and Mrs. Myers for its year ended July 31, 1996, was reasonable. Among other things, Mr. Gelfond heavily based his conclusion on his examination of a 1996 survey of a large number of concrete contracting companies. In his report, he elaborated as follows:

> The Company [petitioner] realized net profit (before owner's compensation and taxes) of 23 percent of revenues for the tax year ended July 31, 1996. As previously stated, the Company also realized an average annual return of 43 percent over the 10 year period ending July 31, 1996 ("the Operating Period")--well above the annual return of a superior mutual fund.[20]

> According to Robert Morris Associates Annual Statement Studies - 1996 ("the Study"), Concrete Contractors (Standard Industrial Classification Code #1771), companies within the 75th percentile (implies the statistic ranks 25th of 100 samples) realized net profit (before officers' compensation and taxes) of 12.9 percent of revenues. As the Company realized net profit of 23.1 percent for the tax year ended July 31, 1996, it is obvious that the Company realized superior financial performance compared to the companies in the Study's data.

---

[20] Mr. Gelfond's compounded average annual return analysis is discussed infra pp. 50-52, in connection with our discussion of petitioner's financial performance and the independent investor test.

The Study's data also reflects that companies in the 75th percentile paid officers' compensation of 8.5 percent of revenues. Although the Company paid officers' compensation of 24.4 percent (including the bonus paid for 1995 performance; 20.4 percent excluding the 1995 bonus) of revenues in the tax year ended July 31, 1996, consideration must be given to the fact that the Company performed far superior (as noted in the previous paragraph) to the companies included in the Study's 75th percentile data.

In addition, the Study does not indicate how many officers are included in the "officers' compensation as a percentage of revenues" calculation. Given that the Myers collectively perform the duties including but not limited to, chief executive officer; chief financial officer; chief operating officer; bookkeeper; personnel manager; and office manager, a percentage of the Myers' compensation should be allocated, and compared to the Study's "Operating Expenses" category. This appropriate allocation would decrease the Company's officers' salaries as a percentage of revenues, and would be a more appropriate and consistent manner of comparing the Company's figures to the Study's data. (As the Study does not offer detail with respect to accounting and office administration salaries as a percentage of revenues, GHP [Mr. Gelfond's consulting firm] is unable to make this more appropriate and consistent comparison.)

Of additional importance for purposes of ascertaining the relevance of the Study's information to the case at hand is the fact that the Study's data is not organized by type of entity (e.g., subchapter S or C corporations). Officers/shareholders of subchapter S corporations often minimize officers' compensation in lieu of cash distributions. As such, officers' compensation as a percent of revenues will generally be less for a subchapter S corporation than a C corporation. Over 85 percent of the companies included in the Study had annual revenues less than $10 million, which could indicate the majority of the companies included in the Study are subchapter S corporations. Therefore, officers' compensation as a percentage of revenues, as reflected in the Study, is likely to be artificially low.

Mr. Gelfond offered no details concerning the specific

concrete contracting companies covered in the survey upon which he based his opinion. He also offered no information on the particular qualifications, skills, services, or compensation of the executives of those companies. We thus are unable to determine: (1) How similar these other unidentified companies and their businesses are to petitioner; and (2) how similar the services their officers performed are to the services performed by Mr. Myers and Mrs. Myers.

Furthermore, although Mr. Gelfond opined that the $1,113,800 in compensation paid to Mr. Myers and Mrs. Myers that year was reasonable, he failed to address the contribution for their benefit to petitioner's qualified retirement plan. This retirement plan contribution represented significant additional compensation to Mr. Myers and Mrs. Myers and was part of their total compensation package during petitioner's fiscal year ended July 31, 1996.

The Memorandum of Board Action authorizing petitioner's entry into the deferred compensation agreements, asserts that the additional future payments of $488,000 were to remedy petitioner's past substantial undercompensation of Mr. Myers and Mrs. Myers. However, as discussed more fully infra pp. 45-47, petitioner and Mr. Gelfond presented no further analysis or explanation of (1) the amount of Mr. Myers' and Mrs. Myers' prior undercompensation during petitioner's earlier years of operation, or (2) the additional compensation needed in later years to

remedy that undercompensation.  As noted by respondent's expert,
Mr. Myers and Mrs. Myers were extremely well compensated
commencing with petitioner's 1993 fiscal year.  We thus give
little weight to petitioner's and Mr. Gelfond's unsupported
contention that petitioner's prior undercompensation of Mr. Myers
and Mrs. Myers still remained largely unremedied when the
deferred compensation agreements were entered into.[21]

We also reject Mr. Gelfond's suggestion that Mr. Myers and
Mrs. Myers are entitled to the compensation that would be
provided to six full-time executives/employees serving as
petitioner's chief executive officer, chief financial officer,
chief operating officer, bookkeeper, personnel manager, and
office manager.  Although Mr. Myers and Mrs. Myers may have
performed some of the duties of six such executives/employees,
they did not perform work equal to the full-time services of six
such executives/employees.[22]

---

[21]Petitioner also asserts that the amounts it treated as
constructive dividends under its settlement with respondent for
its 1993 and 1994 fiscal years, still represented reasonable
compensation to Mr. Myers and Mrs. Myers for purposes of the
case.  We draw no adverse inference from petitioner's subsequent
treatment as dividends under that settlement of part of its 1993
and 1994 fiscal year compensation to Mr. Myers and Mrs. Myers.
See also Fed. R. Evid. 408.

[22]This Court and other courts in numerous reasonable
compensation cases have considered the employee-recipient's
performance of more than one function for the employer but have
concluded that the recipient's reasonable compensation should be
less than the sum of the amounts paid to full-time employees each
of whom occupied one such position.  See, e.g., Labelgraphics,
(continued...)

In sum, Mr. Gelfond failed to compare the executive compensation provided by other companies he surveyed with the situation presented in the case at hand. Consequently, we give his opinion little weight on the issue of comparability of compensation paid by similar companies.

Respondent's Expert

Respondent's expert Stuart J. Packard is employed as a general engineer and valuation and compensation specialist with the Internal Revenue Service. He has a bachelor of science degree in mechanical and civil engineering and also has been a licensed professional builder in the State of Michigan.

Mr. Packard opined that reasonable compensation to Mr. Myers for petitioner's year ended July 31, 1996, would be $300,000, and that reasonable compensation to Mrs. Myers for that year would be $200,000.[23]

In arriving at those reasonable compensation amounts for Mr. Myers and Mrs. Myers, Mr. Packard relied heavily on three

---

[22](...continued)
Inc. v. Commissioner, T.C. Memo. 1998-343 n.6, affd. 221 F.3d 1091 (9th Cir. 2000).

[23]This $500,000 in total combined compensation to Mr. Myers and Mrs. Myers for the 1996 fiscal year that respondent's expert Mr. Packard opined was reasonable is less than the amount respondent determined in the notice of deficiency. However, respondent has not sought to amend his answer to assert an increased deficiency.

surveys: (1) The 1996/1997 Watson Wyatt Data Services survey of over 1,700 companies throughout the nation in various industries (Watson Wyatt survey) (which survey according to Packard's report included an unspecified number of companies in the construction industry); (2) the 1995 Conference Board, Inc., survey of over 1,000 private and public companies throughout the nation in various industries (Conference Board survey) (which survey covered 12 companies in the construction industry--nine of which had 1994 sales of $200 million or more and three of which had 1994 sales of $199 million or less); and (3) his own survey of seven residential homebuilding companies. Mr. Packard then applied regression analysis[24] to the survey sample data (either by the Watson Wyatt or Conference Board surveys themselves or by Mr. Packard) to calculate the mathematically indicated relationship between two chosen factors (e.g., annual sales of each company

---

[24]As explained in an excerpt from the Watson Wyatt survey attached to Mr. Packard's report, regression analysis is a statistical analytical technique that examines the relationship between two selected variables (e.g., compensation and sales volume). The data from each surveyed organization is plotted on a graph. For instance, a company's sales volume is measured along the horizontal (x) axis, and compensation is measured along the vertical (y) axis. Assuming sufficient data is available to provide a realistic picture of the relationship between compensation and sales volume, a regression formula using the "least squares method" is used to calculate the mathematical equation that provides the "best fit" to the data. The resulting equation ($y = bx + a$) can then be used to estimate the y for any value of x within the range of the model. The appropriate range of the model is determined by the data on which it is estimated.

versus its compensation to its chief executive officer). From the calculated mathematical relationship between these two selected factors among companies in each survey, Mr. Packard then extrapolated and computed what he thought the suggested compensation (based on each particular survey) should be for the top two executive officers in a construction industry company having the same annual sales or net income that petitioner had for its 1996 fiscal year in issue.

Mr. Packard further averaged the suggested compensation he determined for the two top officers of a company having the same annual sales as petitioner under (1) his own survey, (2) his percentage of income method, (3) the Watson Wyatt survey, and (4) the Conference Board survey. Based on this foregoing information, Mr. Packard concluded and opined that reasonable compensation for Mr. Myers and Mrs. Myers for petitioner's fiscal year ended July 31, 1996, would be as follows:

| | Mr. Packard's Survey | Percentage of Income Method | Watson Wyatt Survey | Conference Board Survey | Average[1] |
|---|---|---|---|---|---|
| Chairman, President, and CEO | $242,663 | $303,479 | $154,762 | $381,140 | $270,511 |
| Second In Command, Chief Operating Officer (COO) | 169,864 | 212,436 | 119,456 | 277,116 | 194,718 |
| Total Executive Compensation Two Top Officers | 412,527 | 515,915 | 274,218 | 658,256 | 465,229 |

[1]Sum of compensation Mr. Packard determined for the officer based on each of the three surveys and his percentage of income method, divided by 4.

Recommended Top Executive Compensation

| | |
|---|---|
| William Myers, Chairman, President, and CEO | $300,000 |
| Connie Myers, COO, Secretary, Treasurer, and Chief Financial Officer | 200,000 |
| Total Executive Compensation Allowable | 500,000 |

Although statistical surveys analyzing the top executive compensation paid by other construction companies can sometimes be useful for comparison purposes in examining the reasonableness of compensation, such statistical surveys are not dispositive. More importantly, the companies covered in the Watson Wyatt and Conference Board surveys were not reasonably comparable to petitioner. Mr. Packard acknowledged that the Watson Wyatt survey was "normally more appropriate for companies with [annual] sales in excess of $100 million." Similarly, the Conference Board survey also covered construction companies that were generally many times the size of petitioner.

With respect to his own survey of seven other residential homebuilding companies, Mr. Packard provided few specifics regarding these companies he selected, omitting, among other things, their number of employees, the business conditions in the area in which they operated, and how similar their businesses were to petitioner's business. It appears that those seven residential homebuilding companies had annual sales ranging from $5.938 million to $55.628 million, and that their shares were publicly traded. Of those seven companies, the company having the second lowest annual sales had sales of $17.678 million. In addition, Mr. Packard failed to elaborate on the particular skills and qualifications of the individual executives in those companies, and the similarities or dissimilarities of their services to those performed by Mr. Myers and Mrs. Myers.

The surveyed companies that Packard relied upon were generally much larger companies that were not reasonably comparable to petitioner. We do not believe that reasonable compensation to Mr. Myers and Mrs. Myers should be based upon the compensation paid to executives of the companies surveyed by Mr. Packard.[25] Accordingly, we also give Mr. Packard's opinion little weight on the issue of comparability of compensation paid by similar companies.[26]

_____

[25]Indeed, Mr. Packard essentially assumed that the same mathematical relationship (calculated through regression analysis) between the surveyed companies' sales or net income and those companies' compensation to their executives, should hold equally true for petitioner. However, we are not convinced that assumption is valid. In explaining the regression analysis technique, the Watson Wyatt survey notes that "Regression equations are recommended for use in making direct comparisons between management compensation in your own organization and that paid by comparable organizations." Moreover, Mr. Packard failed to explain what, if any, adjustments he had made to take into account the substantial differences between those surveyed companies and petitioner. For instance, with respect to the Watson Wyatt survey, Mr. Packard merely stated: "The information * * * [from that survey] correlated well against the salaries paid to public executives for similarly sized large companies but correlated less well to the compensation paid to the CEO's of small companies. The report did however correlate well with compensation and salaries paid to the non-owner employees of companies regardless of the size of the company."

[26]To be sure, some of the survey data does indicate that the $1,113,800 in total compensation Mr. and Mrs. Myers were paid for petitioner's year ended July 31, 1996, was high. Yet, for this data to establish persuasively that the compensation paid Mr. and Mrs. Myers was unreasonably high, further analysis by respondent's expert was required. Among other things, the total compensation packages furnished the executives working for the much larger companies surveyed should have been evaluated and compared against the total compensation package petitioner

(continued...)

This factor is neutral because neither petitioner's expert Mr. Gelfond nor respondent's expert Mr. Packard proffered persuasive comparable pay data.

### H. Petitioner's Salary Policy to All Its Employees

Courts have considered salaries paid to other employees of a business in deciding whether compensation is reasonable. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159. We look to this factor to determine whether Mr. and Mrs. Myers were compensated differently from petitioner's other employees solely because of their status as shareholders.

Petitioner's other employees (its construction workers) were compensated on a totally different basis from Mr. Myers and Mrs. Myers (its two sole officer-director-shareholders and the only members of its management team). The construction workers were compensated on an hourly basis. Mr. Myers testified that the construction workers (who were nonunion) received hourly wages, including higher hourly wages for any overtime work, and were paid weekly, and that he tried to pay them above average wages for the area. However, he added, petitioner had no uniform pay

---

[26](...continued)
furnished Mr. and Mrs. Myers. In this connection, we note that top executives of large, publicly traded companies often will receive stock options and deferred compensations as part of their compensation package. However, the record in the case at hand does not disclose what, if any, stock options the executives surveyed received. See, e.g. Labelgraphics, Inc. v. Commissioner, 221 F.3d 1091, 1097-1098 n.9 (9th Cir. 2000).

scale for its construction workers, as Mr. Myers set each worker's hourly wage rate on an individual basis. The workers further all usually received Christmas bonuses, and certain key workers were paid additional bonuses.

In contrast, Mr. Myers and Mrs. Myers annually have set their own compensation.

For obvious reasons, Mr. and Mrs. Myers, who were the only members of petitioner's management team, were compensated on a different basis from petitioner's construction workers. No other employees of petitioner performed services similar to those of Mr. and Mrs. Myers.

This factor is neutral.

I. Compensation Paid to Mr. Myers and Mrs. Myers in Previous Years

Where a large salary increase is in issue (as in the case at hand), it may be useful to compare past and present duties and salary payments, Elliotts, Inc. v. Commissioner, 716 F.2d at 1245, in order to determine whether and to what extent the current payments represent compensation for services performed in prior years, which can be currently deductible. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119-120 (1930); Am. Foundry v. Commissioner, 59 T.C. 231, 239 (1972), affd. in part and revd. in part 536 F.2d 289 (9th Cir. 1976).

As indicated previously, respondent's expert Mr. Packard acknowledged that Mr. and Mrs. Myers were undercompensated during

petitioner's early years of operation.  However, he also noted that Mr. and Mrs. Myers were extremely well compensated commencing with petitioner's 1993 fiscal year.  Mr. Packard opined that petitioner's undercompensation of Mr. and Mrs. Myers in prior years had been fully remedied by the beginning of the 1996 fiscal year in issue.

From January 1, 1987 through July 31, 1996, petitioner paid Mr. and Mrs. Myers the annual amounts of compensation and had the net income (before taxes and officer compensation) set forth below.

| FYE July 31 | Mr. Myers | Mrs. Myers | Total Officer Compensation | Net Income |
|---|---|---|---|---|
| 1987 | $30,000 | $6,750 | $36,750 | $58,299 |
| 1988 | 54,500 | 12,950 | 67,450 | 141,745 |
| 1989 | 43,000 | 15,050 | 58,050 | 104,705 |
| 1990 | 83,000 | 29,650 | 112,650 | 158,100 |
| 1991 | 173,600 | 12,500 | 186,100 | 251,012 |
| 1992 | 165,000 | 65,000 | 230,000 | 233,852 |
| 1993 | 457,785 | 156,000 | 613,785 | 689,195 |
| 1994 | 630,750 | 271,750 | 902,500 | 1,192,457 |
| 1995 | 455,000 | 247,500 | 702,500 | 778,656 |
| 1996 | 749,500 | 364,300 | 1,113,800 | 1,051,896 |

We agree that Mr. and Mrs. Myers received relatively modest compensation during petitioner's early years of operation, and that petitioner's business in those years was not generating sufficient net income for it to have paid Mr. Myers and Mrs. Myers substantially higher compensation and also to have repaid the $77,237 of advances.  As Mr. and Mrs. Myers testified, during those early years, they took less annual compensation in order to

build up petitioner, as they did not want petitioner to borrow from third parties.

However, petitioner provided insufficient evidence to establish the amount of the undercompensation of Mr. and Mrs. Myers during its early years. Neither did petitioner and its expert address whether such past undercompensation had been recovered through its 1996 fiscal year in issue. There are only some vague statements in the record by Mr. Myers and Mrs. Myers that this past undercompensation (which they and petitioner's expert failed to quantify) never had been made up to them. The fact of undercompensation in the past alone is not enough. For a reasonable compensation deduction for a subsequent year in issue to be allowed to a taxpayer-employer for purportedly remedying alleged undercompensation of an employee in earlier years, the taxpayer-employer must, among other things, establish (1) the amount of its undercompensation of that employee in those earlier years, and (2) that this past undercompensation still remained unremedied by the later year in issue. Am. Foundry v. Commissioner, supra at 239-240; Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343.

During the trial, the Court pointed out the need for petitioner to provide persuasive evidence establishing what part of the 1996 fiscal year compensation in issue to Mr. and Mrs. Myers was catchup pay. Also, as noted supra, the Memorandum of Board Action covering the compensation package furnished Mr. and

Mrs. Myers during the 1996 fiscal year indicated another $488,000 in "deferred compensation" petitioner agreed to pay was to remedy its alleged substantial undercompensation of them in prior years. The Memorandum stated that the board, after an exhaustive review of the compensation of Mr. and Mrs. Myers since petitioner's inception, determined that Mr. and Mrs. Myers had been substantially undercompensated in prior years. Yet, no convincing analysis or review data was entered in evidence by petitioner. Neither petitioner nor its expert Mr. Gelfond addressed what amount, if any, of catchup pay to Mr. and Mrs. Myers was still required as of the 1996 fiscal year in issue.

Mr. and Mrs. Myers have been extremely well compensated since petitioner's 1993 fiscal year. Hence petitioner's past undercompensation of them might very well have been fully recovered before its 1996 fiscal year in issue. Moreover, the Memorandum of Board Action is susceptible to the interpretation that the sole remedy for any undercompensation of prior years was to be the $488,000 of deferred compensation payments. We conclude that petitioner has failed to establish that any part of the salary payments respondent disallowed for its 1996 fiscal year in issue qualifies as reasonable compensation to Mr. Myers and Mrs. Myers for past services in prior years. Rule 142(a); Am. Foundry v. Commissioner, supra; Labelgraphics, Inc. v.

Commissioner, supra.

This factor favors respondent.

J. Independent Investor Test and Petitioner's Financial Performance

As indicated previously, the Courts of Appeals for the Second, Seventh, and Ninth Circuits have applied an independent investor test in determining whether payments to an employee-shareholder are deductible by a taxpayer-corporation as reasonable compensation under section 162.

In applying their respective versions of the independent investor test, the Courts of Appeals for the Second and Ninth Circuits have considered many of the same or similar factors in determining reasonable compensation as examined above, and they have used the same totality of the circumstances approach adopted by the Court of Appeals for the Tenth Circuit in Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d at 179. Dexsil Corp. v. Commissioner, 147 F.3d 96, 100-101 (2d Cir. 1998) (noting that the independent investor test applied is not a separate autonomous factor; rather, it provides a lens through which the entire analysis should be viewed), vacating and remanding T.C. Memo. 1995-135; Rapco, Inc. v. Commissioner, 85 F.3d 950, 954-955 (2d Cir. 1996) (applying a multifactor test from perspective of an independent investor), affg. T.C. Memo. 1995-128; Elliotts, Inc. v. Commissioner, 716 F.2d at 1245 (same).

The Court of Appeals for the Seventh Circuit, on the other hand, treats a corporation's enjoyment of a higher than average return on shareholder equity as presumptively establishing the reasonableness of a shareholder-officer's compensation, without regard to the multifactor analysis. Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 838-839 (7th Cir. 1999), revg. T.C. Memo. 1998-220.

Central to both variants of the independent investor test is the need to examine the return on equity of the taxpayer-corporation (where the employee-shareholder receiving the compensation in issue also controls that taxpayer) from the perspective of a hypothetical independent investor. As the Court of Appeals for the Ninth Circuit explained in Elliotts, Inc. v. Commissioner, supra at 1245-1247:

> In evaluating the reasonableness of compensation paid to a shareholder-employee, particularly a sole shareholder, it is helpful to consider the matter from the perspective of a hypothetical independent investor. A relevant inquiry is whether an inactive, independent investor would be willing to compensate the employee as he was compensated. The nature and quality of the services should be considered, as well as the effect of those services on the return the investor is seeing on his investment. The corporation's rate of return on equity would be relevant to the independent investor in assessing the reasonableness of compensation in a small corporation where excessive compensation would noticeably decrease the rate of return.
>
> *     *     *     *     *     *     *
>
> In this case, where  * * *  [the employee receiving the compensation in issue] was the sole shareholder, the sort of relationship existed that

warrants scrutiny. The mere existence of such a relationship, however, when coupled with an absence of dividend payments, does not necessarily lead to the conclusion that the amount of compensation is unreasonably high. Further exploration of the situation is necessary.

In such a situation, as discussed earlier, it is appropriate to evaluate the compensation payments from the perspective of a hypothetical independent shareholder. If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Fn. ref. omitted.]

Even under the variants of the independent investor test applied by the Courts of Appeals for the Second, Seventh, and Ninth Circuits, a firm's high or low return on equity may not be dispositive of the reasonableness of a shareholder-officer's compensation. Exacto Spring Corp. v. Commissioner, supra at 839 (noting possible situations where presumption of compensation's reasonableness may be rebutted by showing that company's high return was not due to shareholder-officer's efforts); Elliotts, Inc. v. Commissioner, 716 F.2d at 1247 n.5 (noting a shareholder-employee's compensation may be reasonable even though company suffers a loss or inadequate return on equity).

Petitioner and its expert Mr. Gelfond contend that an independent investor would be satisfied with the 43.82 percent

compounded annual rate of return they calculate was enjoyed through the year ended July 31, 1996, on that investor's initial $10,000 investment in the corporation. Mr. Gelfond computed this 43.82 percent compounded annual rate by using a present-value-future-value formula where: Present value equals $10,000 (the shareholder initial investment); future value equals $378,542 (the company's stated "equity" or net book asset value at the end of the 1996 fiscal year before consideration of its deferred payment obligation to Mr. Myers and Mrs. Myers); and N (the number of years over which that investment is annually compounded) equals 10.

Under the independent investor test, a company's annual return on equity usually examines that company's net income after taxes for that year. More importantly, the shareholders' equity in the company, upon which an annual return is calculated, includes not just the shareholders' initial invested capital but the company's prior accumulated earnings. Dexsil Corp. v. Commissioner, 147 F.3d at 99; Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343; see also Exacto Spring Corp. v. Commissioner, supra at 837 (noting, among other things, that "What investors care about is the corporate income available to pay dividends or be reinvested"), revg. T.C. Memo. 1998-220; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326-1327 (5th Cir. 1987) (noting that the prime indicator of the

return a corporation is earning for its investor is its return on equity).

In Eberl's Claim Serv., Inc. v. Commissioner, T.C. Memo. 1999-211, we rejected the taxpayer's argument that the corporation's "return on equity" should be based on its founding shareholder's small initial investment of $500, and noted that the taxpayer had cited no case in which a court gave significant weight to a high return based on a founding shareholder's small initial investment. We explained that the courts have instead relied on other financial factors when a shareholder's capital investment is small, citing Alpha Med., Inc. v. Commissioner, 172 F.3d 942 (6th Cir. 1999) (Court derived return on equity by taking increase in equity for the year at issue plus the dividends paid that year, divided by shareholder's $1,000 capital investment plus retained earnings at the beginning of that year) revg. T.C. Memo. 1997-464 n.8; Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343 (cumulative average return on equity may be skewed by high annual returns for earlier years in which equity was low); H&A Intl. Jewelry, Ltd. v. Commissioner, T.C. Memo. 1997-467.

In contrast to petitioner, respondent, among other things, calculated petitioner's return on equity as equaling petitioner's net income for a year, divided by petitioner's equity at the beginning of that year. We note that in various reasonable

compensation cases, three different approaches generally have been used to compute a company's return on equity. The company's net income that year has been divided by either: (1) Its equity at the beginning of that year (e.g., <u>Alpha Med., Inc. v. Commissioner</u>, T.C. Memo. 1997-464 n.8, (2) its ending equity that year (e.g., <u>Labelgraphics, Inc. v. Commissioner</u>, T.C. Memo. 1998-343), or (3) the year's average equity (e.g., <u>Dexsil Corp. v. Commissioner</u>, 147 F.3d at 99.

Over the period from January 1, 1987, through July 31, 1996, petitioner's annual net profit or net loss after taxes, equity (beginning, yearend, and year's average), and return on equity (calculated under each of the three foregoing approaches, before consideration of petitioner's "deferred compensation" obligation to Mr. and Mrs. Myers) are as set forth below:

| FYE July 31 | Net Profit (Net Loss) After Taxes | Equity | | | Return on Equity[2] | | |
|---|---|---|---|---|---|---|---|
| | | Begin. Equity | Yearend Equity | Year's Avg. Eq.[1] | Begin. Equity | Yearend Equity | Year's Avg. Eq. |
| 1987 | $18,317 | $10,000 | $31,405 | $20,703 | 183.17% | 58.33% | 88.48% |
| 1988 | 60,729 | 31,405 | 101,931 | 66,668 | 193.37 | 59.58 | 91.09 |
| 1989 | 46,655 | 101,931 | 134,073 | 117,502 | 45.77 | 34.80 | 39.54 |
| 1990 | 38,632 | 134,073 | 172,011 | 153,042 | 28.81 | 22.46 | 25.24 |
| 1991 | 53,684 | 172,011 | 218,462 | 195,237 | 31.21 | 24.57 | 27.50 |
| 1992 | 3,274 | 218,462 | 221,554 | 220,008 | 1.50 | 1.48 | 1.49 |
| 1993 | 61,521 | 221,554 | 282,989 | 252,272 | 27.77 | 21.74 | 24.39 |
| 1994 | 193,624 | 282,989 | 475,808 | 379,399 | 68.42 | 40.69 | 51.03 |
| 1995 | 59,292 | 475,808 | 534,443 | 505,126 | 12.46 | 11.09 | 11.74 |
| 1996 | (61,904) | 534,443 | 378,542 | 456,493 | (11.58) | (16.35) | (13.56) |

[1]Sum of beginning equity plus yearend equity, divided by 2.
[2]Net profit or net loss after taxes, divided by equity.

Regardless of which of the three approaches is used to calculate petitioner's return on equity, for the 1996 fiscal year in issue petitioner suffered a negative return on equity even

before consideration of petitioner's "deferred compensation" obligation to Mr. and Mrs. Myers.

Some prior reasonable compensation cases have also examined and considered the taxpayer's cumulative average return on equity. E.g., Labelgraphics, Inc. v. Commissioner, 221 F.3d 1091, 1099 (9th Cir. 2000); Dexsil Corp. v. Commissioner, T.C. Memo. 1999-155. From January 1, 1987, through July 31, 1996, petitioner's annual return on equity (under each of the three approaches used supra, before consideration of petitioner's "deferred compensation" obligation to Mr. and Mrs. Myers) and cumulative average return on equity (without regard to the deferred compensation obligation) are as set forth below:

| FYE July 31 | Return on Equity | | | Cum. Avg. Return on Equity[1] | | |
|---|---|---|---|---|---|---|
| | Begin. Equity | Yearend Equity | Year's Avg. Eq. | Begin. Equity | Yearend Equity | Year's Avg. Eq. |
| 1987 | 183.17% | 58.33% | 88.48% | 183.17% | 58.33% | 88.48% |
| 1988 | 193.37 | 59.58 | 91.09 | 188.27 | 58.96 | 89.79 |
| 1989 | 45.77 | 34.80 | 39.54 | 140.77 | 50.90 | 73.04 |
| 1990 | 28.81 | 22.46 | 25.24 | 112.78 | 43.79 | 61.09 |
| 1991 | 31.21 | 24.57 | 27.50 | 96.47 | 39.95 | 54.37 |
| 1992 | 1.50 | 1.48 | 1.49 | 80.64 | 33.54 | 45.56 |
| 1993 | 27.77 | 21.74 | 24.39 | 73.09 | 31.85 | 42.53 |
| 1994 | 68.42 | 40.69 | 51.03 | 72.50 | 32.96 | 43.60 |
| 1995 | 12.46 | 11.09 | 11.74 | 65.83 | 30.53 | 40.06 |
| 1996 | (11.58) | (16.35) | (13.56) | 58.09 | 25.84 | 34.69 |

[1]Sum of current year's return on equity and each prior year's return on equity, divided by petitioner's number of years of operation through current year.

In our opinion, the cumulative average annual return on equity petitioner experienced over the period from January 1, 1987 through July 31, 1996, would not be as significant to an independent investor as petitioner's return on equity for the

current 1996 fiscal year in issue.  This higher cumulative
average annual return is skewed by the much higher annual returns
on equity petitioner enjoyed during its early years of operation,
when its equity was much lower.  See, e.g. Labelgraphics, Inc. v.
Commissioner, 221 F.3d at 1099 (88.5-percent return on $43,482
equity enjoyed during the taxpayer's first year of operation is
not particularly meaningful to a present investor judging return
on the current year's equity in excess of $1 million).  In
addition, the higher cumulative average return on equity is even
less significant where, as discussed previously, petitioner's
past undercompensation of Mr. and Mrs. Myers, during prior years
of operation, to the extent not fully recovered prior to the 1996
fiscal year in issue, was intended to be remedied by the deferred
compensation agreements adopted during that year.  See also,
e.g., Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160.

At any rate, petitioner has failed to show that an
independent-investor-return-on-equity analysis establishes that
the compensation in issue paid to Mr. and Mrs. Myers for its year
ended July 31, 1996, was reasonable.[27]  For that year, even before

[27]Petitioner further failed to address respondent's argument
that the $77,237 advance Mr. and Mrs. Myers made to it in 1987
should also be included in shareholder invested capital for
purposes of calculating petitioner's annual return on equity.
Although petitioner did repay or distribute an amount equal to
the $77,237 advance to Mr. and Mrs. Myers during its first 4
years of operation, petitioner provided neither a factual record
nor legal argument that would enable the Court properly to
determine whether the advance represented debt or equity, or
                                                (continued...)

consideration of its future deferred payment obligation to Mr. and Mrs. Myers, petitioner had a $61,904 net loss after taxes, suffered a negative return on equity (ranging from a negative 11.58-percent return to a negative 16.35-percent return under the three approaches used supra to calculate its annual return on equity), and experienced a $155,901 reduction in its equity or net asset value (i.e., its $534,443 of equity at the beginning of the 1996 fiscal year, less its $378,542 yearend equity).[28] We do

------

[27](...continued)
should be considered part of petitioner's invested capital for the purpose of determining the overall compounded rate of return that would be deemed to have accrued to an independent investor as of the end of the fiscal year for which we must analyze petitioner's financial performance. Obviously, the addition of the $77,237 to petitioner's equity or invested capital would reduce the compounded rate of return regarded as having accrued as of the end of the fiscal year in issue to an independent investor who had purchased all of petitioner's capital stock at its inception. It can also be argued that the debt-equity distinction should have no bearing on assessing the overall return that accrued on the total amount of funds--$87,237--made available to petitioner by its officer-shareholders. See Pratt, "The Debt-Equity Distinction in a Second-Best World", 53 Vand. L. Rev. 1056 (2000).

[28]Petitioner notes that, although it reported a $61,904 net loss after taxes for its 1996 fiscal year, $183,000 of the bonuses paid to Mr. and Mrs. Myers that year were belated bonuses to them for its 1995 fiscal year. Petitioner argues that this $183,000, in effect, should be reallocated and treated as a fiscal year 1995 business expense for purposes of determining its annual returns on equity for its 1995 and 1996 fiscal years, since the $183,000 was reasonable compensation for services Mr. and Mrs. Myers rendered during the 1995 fiscal year. In the notice of deficiency, respondent allowed petitioner a deduction under sec. 162 for the $238,800 in total bonuses it paid to Mr. and Mrs. Myers during the 1996 fiscal year. We conclude that petitioner's reallocation argument does not help its case. If

(continued...)

not believe an independent investor would be happy with petitioner's financial performance for its 1996 fiscal year, especially where the total officer compensation paid to Mr. and Mrs. Myers for that year was almost three times the investor's year-end equity in the company ($1,113,800, divided by $378,542).[29]

This factor favors respondent.

---

[28](...continued)
the $183,000 bonus payment is reallocated to petitioner's 1995 fiscal year, petitioner, would have a revised net loss after taxes for that year of $123,708, a revised yearend equity of $368,307, and a revised return on equity ranging from a negative 26.00 percent to a negative 33.59 percent (under the three approaches used supra). We think petitioner's resulting negative return on equity for fiscal year 1995 would be equally unsatisfactory to an independent investor.

[29]Under an independent-investor-return-on-equity-analysis the corporation's greatly increased market value can also be probative of the value of a shareholder-officer's services. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326 (5th Cir. 1987), affg. T.C. Memo. 1985-267 (noting that an investor may garner a return on investment through stock appreciation); Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 n.6 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. However, petitioner offered no evidence or argument regarding appreciation in the market value of its stock.

K. Conclusion

Petitioner has failed to show it is entitled to a larger compensation deduction under section 162 than respondent allowed in the statutory notice.  We therefore sustain respondent's determination disallowing petitioner's deduction of $353,911 of the salaries paid to Mr. and Mrs. Myers for the year ended July 31, 1996.  Rule 142(a); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d at 179; Nor-Cal Adjusters v. Commissioner, 503 F.2d at 361.

Decision will be entered

for respondent.

APPENDIX – ANNUAL COMPENSATION PAID MR. MYERS AND MRS. MYERS
FROM JANUARY 1, 1987, THROUGH JULY 31, 1996

| | FYE 7/31/87 | FYE 7/31/88 | FYE 7/31/89 | FYE 7/31/90 | FYE 7/31/91 | FYE 7/31/92 | FYE 7/31/93 | FYE 7/31/94 | FYE 7/31/95 | FYE 7/31/96 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Mr. Myers-** | | | | | | | | | | |
| Salary | [1] | [1] | [1] | [1] | $60,000 | $100,000 | $100,000 | $100,000 | $100,000 | $586,500 |
| Bonus | [1] | [1] | [1] | [1] | 113,600 | 65,000 | 357,785 | 530,750 | 355,000 | 163,000[2] |
| Total | $30,000 | $54,500 | $43,000 | $83,000 | 173,600 | 165,000 | 457,785 | 630,750 | 455,000 | 749,500 |
| **Mrs. Myers-** | | | | | | | | | | |
| Salary | [1] | [1] | [1] | [1] | $10,000 | $12,000 | $30,000 | $30,000 | $60,000 | $288,500 |
| Bonus | [1] | [1] | [1] | [1] | 2,500 | 53,000 | 126,000 | 241,750 | 187,500 | 75,800[3] |
| Total | $6,750 | $12,950 | $15,050 | $29,650 | 12,500 | 65,000 | 156,000 | 271,750 | 247,500 | 364,300 |

[1] No breakdown between salary and bonus is available for the period from January 1, 1987, through July 31, 1990.
[2] Of this $163,000, $125,000 was said to be a bonus for fiscal year 1995 and $38,000 a bonus for fiscal year 1996.
[3] Of this 75,800, $58,000 was said to be a bonus for fiscal year 1995 and $17,800 a bonus for fiscal year 1996.